## COURT OF APPEALS.

### May, 1917.

## THE PEOPLE v. MICHAEL SEPPI.

(221 N. Y. 62.)

(1). MURDER—EVIDENCE OF IDENTIFICATION OF DEFENDANT AS PERSON WHO COMMITTED THE CRIME WHEN INCREDIBLE AS MATTER OF LAW.

Where a witness positively identifies a defendant as the man who committed a crime, the weight of the evidence of identification is for the jury unless it is incredible as a matter of law. But opinions expressed of the identity of a defendant, particularly when they depend upon impressions obtained in haste and excitement, should not be bolstered by self-serving performances of no probative value and yet strongly calculated to influence a jury of laymen not versed in the rules of evidence. (People v. Jung Hing, 212 N. Y. 393, 401, followed.)

(2). SAME.

On examination of the evidence in this case, *held*, that the identity of the defendant as the person who committed the homicide for which he was on trial was not shown with sufficient certainty to preclude a reasonable possibility of mistake.

(3). SAME—ERRONEOUS CHARGE OF COURT AS TO EFFECT OF EVIDENCE OF FORMER IDENTIFICATION.

After the defendant was arrested on a charge of homicide and nearly three months after the homicide, some of the witnesses were taken to a detective bureau and there shown seven or eight men, but one of whom, and he, the defendant, was an Italian. The men were placed in a line with their backs to the entrance of the room and the witnesses were brought in one at a time to look at them. Two of the witnesses on request, it is alleged, pointed out the defendant. One witness identified defendant as the person he saw committing the homicide and running away therefrom, and another witness identified defendant as a man he followed on his bicycle from the immediate neighborhood of the homicide, and who threw away his revolver during the pursuit. Evidence was offered by the prosecution of what occurred at the detective bureau. The evidence so received was subject to objection and exception. It was undeniably offered and received for the purpose of bolstering the testimony already given at the trial by these two witnesses in identification of the defendant, and was so

treated by the district attorney and the court. *Held*, that the admission of this evidence was prejudicial to the defendant and ground for reversal. (People v. Jung Hing, 212 N. Y. 393, 401, followed.)

(4). MOTIVE FOR CRIME—ERRONEOUS CHARGE BY COURT THAT MOTIVE SHOULD NOT BE CONSIDERED BY JURY.

Proof of motive is never indispensable to conviction for crime. Where testimony is presented on a trial which satisfies a jury that the defendant has committed a crime, it is sufficient for conviction although no motive therefor has been shown. In determining the guilt or innocence of a defendant, however, the question of motive is always to be considered by the jury in their deliberations. It was error, therefore, for the court to charge the jury that " motive plays absolutely no part in your deliberations."

(Argued May 9, 1917; decided May 25, 1917.)

APPEAL from a judgment of the Supreme Court, rendered January 29, 1917, at a Trial Term for the county of Kings, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*Robert H. Elder* and *Otho S. Bowling,* for appellant. The evidence of identity is so weak and unsatisfactory that a new trial should be ordered. (People v. Cassidy, 160 App. Div. 651.) The trial court erred in permitting the People to show, as part of their direct examinations, that Oelrich and Stern had identified Seppi at police headquarters. (People v. Jung Hing, 212 N. Y. 393; People v. Bertlini, 218 N. Y. 584; Dilleber v. Home Life Ins. Co., 69 N. Y. 256; Schultz v. Union Ry. Co., 181 N. Y. 33; Wilson v. Nassau Electric Ry. Co., 56 App. Div. 570.). The court erred in charging the jury as to motive. (Kennedy v. People, 39 N. Y. 245; Pointer v. United States, 151 U. S. 396.)

*Henry E. Lewis, District Attorney (Ralph E. Hemstreet* and *Harry G. Anderson* of counsel), for respondent. All of the elements of murder in the first degree, as defined in subdivision

1 of section 1044 of the Penal Law, were proven by the prosecution beyond a reasonable doubt. (People v. Trybus, 219 N. Y. 18; People v. Sanducci, 195 N. Y. 361; People v. Decker, 157 N. Y. 186; People v. Ferraro, 161 N. Y. 365; People v. Krist, 168 N. Y. 19; People v. Gaimari, 176 N. Y. 84; People v. Seidenshner, 210 N. Y. 341.) No error was committed by the court with reference to its charge on the subject of motive. (People v. Feigenbaum, 148 N. Y. 636; People v. Scott, 153 N. Y. 40; People v. Dinser, 192 N. Y. 80; People v. Sanducci, 195 N. Y. 361.)

CHASE, J.:

On the afternoon of September 11, 1916, while Ernest Parisi was walking near the corner of Berriman street and Belmont avenue in the borough of Brooklyn, New York City, he was shot by a person who came up behind him. He died from the result of the wound. The man who fired the shot immediately thereafter turned and ran northerly along the east side of Berriman street to the corner of Pitkin avenue; thence westerly and diagonally through Pitkin avenue to Shepherd street; thence north on Shepherd street to Glenmore avenue; thence east on Glenmore avenue to Essex street; thence north on Essex street, beyond which his flight has not been traced.

Two months after the homicide the defendant was arrested in the borough of Brooklyn charged with the crime. The man who shot Parisi committed the crime of murder in the first degree. (Penal Law, § 1044.) The question of vital importance at the trial was whether the defendant is the man who committed the crime. When he was arrested the officer making the arrest said to him: "You are charged with shooting a man by the name of Parisi in East New York. * * * What have you got to say about it?" He replied: "I have nothing at all to say. I won't say anything until I see my lawyer." The officer asked him: "Where have you been all this time?"

and he replied, " Right around." He was also questioned in his native language by an Italian officer. He was asked: " Why don't you tell us as to why and how you shot this man at East New York?" He replied: " I didn't shoot anybody. I don't know anything about it. I want to consult my lawyer." The officer asked, " Who is your lawyer?" and he replied, " I don't know yet." It does not appear that he at any time thereafter talked about the homicide.

On the day of the homicide and a little more than an hour before it occurred the deceased and the defendant met in a shoe shop on Glenmore avenue, which is next door to a barber shop. The defendant spoke about the barber, who is his cousin, and said that he is always sleepy, and they laughed. The shoemaker said that the barber " wanted to become a deputy." Parisi said, " He is an imbecile." The defendant inquired, " Why is he an imbecile?" and Parisi repeated, " He is an imbecile," and all laughed again.

The shoemaker was polishing the defendant's shoes, and as Parisi was about to go out of the shop the defendant said, " Wait, I want to speak to you," and shortly thereafter they went out together. Parisi returned to the shop a little later and inquired, " Where is the barber's cousin?" The shoemaker replied that he did not know, and Parisi went away.

The conversation at the shoemaker's was in a low tone of voice, and it does not appear that there was any anger on the part of either person taking part therein. Nothing was shown at the trial tending to prove any threat or enmity by defendant against Parisi or any motive, real or imaginary, on his part to kill Parisi.

Nearly one-quarter of the block at the corner of Berriman street and Belmont avenue where the homicide occurred was at the time vacant. In such vacant lot two boys were playing and they heard a shot and looking around saw Parisi turn to face the man who fired the shot. The assailant was then very close

to Parisi and he shot the second time, immediately upon which Parisi fell to the walk, whereupon the assailant turned and ran north on Berriman street as hereinbefore stated.

The two boys ran out of the lot. One, Oelrich, thirteen years old, remained near Parisi. The other boy, Aschentrup, fourteen years old, ran after the slayer. When the slayer was about half way along the first block another boy, Koehler, hearing shots, ran out of a house and joined in running after the fleeing man. A third boy, on roller skates, Rollo, came around the corner of Belmont avenue at or about the time the shots were fired, and he joined the other two in the chase. Near the corner of Shepherd street and Pitkin avenue was a boy, Stern, fourteen years old, on a bicycle, and he followed with the other three.

The boys followed the slayer until at the middle of the block on Glenmore avenue, between Shepherd and Essex streets. When the slayer reached that point he threw his pistol, which he had been carrying, into the grass by a junk shop. The boys stopped to pick up and examine the pistol and the slayer made his escape.

Aschentrup, one of the boys that was in the lot at the time of the homicide, followed the slayer until he threw away his pistol. He testified that he did not see the man's face, but that he did get a good look at his back; that the man had on a light gray suit and wore a black derby hat and was thin and short. He was unable to identify the defendant as the man who shot Parisi.

Koehler, the boy who ran out of his house only a few feet behind the fleeing man, testified that he had a good look at the man while he was running but that he did not see his face; that he had on a gray suit and a derby hat. He was unable to identify the defendant as the fleeing man.

Rollo, the boy on the roller skates, testified that the man was round shouldered and had a short neck; that he had on a light

suit, but that he did not see his face. He was unable to identify the defendant as the man whom he followed.

Oelrich, who was about thirteen years of age and remained with the man who was shot, testified that he had a good look at the man's back but did not see his face. He further testified that the man had a short neck and broad shoulders, and that the defendant is the man who shot Parisi.

Stern, the boy on the bicycle, is the principal reliance of the prosecution. He testified that the man was short, broad shouldered, low necked, and had a small head. His description of the man, so far as his dress is concerned, is materially different from the others. While the others testified that the man had on a light suit and a derby hat, Stern testified that he had on a jacket, the color of which he does not remember, and that he wore a soft hat. He further testified that the defendant is the man that he followed and who threw away the revolver. He had never seen the man before and did not see the defendant until about three months after the homicide.

The defendant's wife testified that she remembers Monday, the 11th of September, by reason of certain occurrences which she detailed — that the defendant went to East New York on that day with his little boy and returned to his home with the boy at half-past four. The homicide occurred about one-quarter to five.

Another witness testified that she remembers Monday, the 11th of September, by reason of certain occurrences which she detailed; that she called on the defendant's wife that afternoon; and that while she was making the call and between a quarter and half-past four the defendant came home with his little boy.

Who killed Parisi? Was the defendant the man who fired the shots and then ran, followed by the boys Aschentrup and others, until he threw away his revolver and escaped as stated?

The special effort of the prosecution was to identify the defendant as the slayer. Where a witness positively identifies

a defendant as the man who committed a crime, the weight of the evidence of identification is for the jury unless it is incredible as a matter of law. (People v. Trybus, 219 N. Y. 18; People v. Sanducci, 195 N. Y. 361; People v. Seidenshner, 210 N. Y. 341.) The identity of the defendant as the person who committed the homicide was not in this case shown with sufficient certainty to preclude a reasonable possibility of mistake. Opinions expressed of the identity of a defendant, particularly when they depend upon impressions obtained in haste and excitement, should not be bolstered by self-serving performances of no probative value and yet strongly calculated to influence a jury of laymen, not versed in the rules of evidence. (People v. Jung Hing, 212 N. Y. 393, 401.)

After the defendant was arrested, and nearly three months after the homicide, the boys Oelrich and Stern, with some others, were taken to a detective bureau and there shown seven or eight men, but one of whom, and he, the defendant, was an Italian. The men were placed in a line with their backs to the entrance of the room and the boys were brought in one at a time to look at them. Oelrich and Stern, on request, it is alleged, pointed out the defendant — Oelrich as the one that he saw committing the homicide and running away therefrom, and Stern as the man he followed on his bicycle and who threw away his revolver.

Evidence was offered by the prosecution of what occurred at the detective bureau. The first of the evidence so received was subject to objection and exception. It was undeniably offered and received for the purpose of bolstering up the testimony already given at the trial by Oelrich and Stern in identification of the defendant.

Counsel for the defendant made use of it in his closing address to the jury. The court in charging the jury among other things said: "And the boy who saw the second shot * * * says that he at that time made such an observation of some

physical characteristics of the defendant as later enabled him to *pick him out of a line of men at the police detective headquarters."* And, again, " the real question with which you wrestle is the value of the testimony of the Stern boy, who claims he saw the defendant's face and subsequently *picked him out at the detective headquarters,* and the value of the testimony of the boy Oelrich, who gave you, as I stated, some physical characteristics said to apply to, or to fit the defendant and who also picked out a man whom he regarded as bearing those characteristics who was *lined up with others at the police detective headquarters or bureau, the person so picked out being this defendant."*

In the Jung Hing case (*supra*) the effect of such testimony was considered by this court. In that case the defendant was placed in line with thirteen or fourteen other Chinamen and it was said " the women  *  *  *  were brought in singly, and each in turn placed her hand on the defendant as a token of her identification of the defendant as the man who shot the deceased. This was proper enough for the preliminary purpose of determining in the police station whether any one of the Chinamen in the line should be held for examination as the probable assailant of the deceased. It was quite another thing, however, to prove *de novo,* on the trial under review, that the witnesses who here testified to the defendant's identity had given similar testimony in the police station. This was, in effect, but a corroboration of these witnesses by their own previous declarations or acts.  *  *  *  The evidence of what occurred in the police station was no different in principle than though the same witnesses had been allowed to state what their testimony on this subject had been on the defendant's first trial, where the jury disagreed. It was nothing more nor less than a bolstering of the present testimony of these witnesses by showing that on a prior occasion they said or did the same thing." (P. 400.)

33

The claim of the respondent that this case can be distinguished from the Jung Hing case cannot be sustained. The admission of the self-serving declarations of the witnesses Oelrich and Stern as to their identification of the defendant at the detective bureau was prejudicial to the defendant.

The court in charging the jury further said: " Motive plays absolutely no part in your deliberations. The prosecution was not required to show you any motive for the crime. In fact the prosecution is never bound to prove a motive for the commission of a crime. Motive furnishes corroboration in a case depending upon circumstantial evidence, but that is not this case. This case is one of direct evidence that this defendant shot or else that the man who did the shooting is not in this court room so far as we know."

Proof of motive is never indispensable to conviction for crime. (Pointer v. U. S., 151 U. S. 396.) Where testimony is presented on a trial which satisfies a jury that the defendant has committed a crime, it is sufficient for conviction although no motive therefor has been shown. (People v. Feigenbaum, 148 N. Y. 636.) In determining the guilt or innocence of a defendant, however, the question of motive is always to be considered by the jury in their deliberations. It was error, therefore, for the court to charge the jury that " motive plays absolutely no part in your deliberations."

We cannot say, under section 542 of the Code of Criminal Procedure, in this case that the errors occurring on the trial did not affect the defendant's substantial rights.

The judgment of conviction should be reversed and a new trial ordered.

HISCOCK, Ch. J., COLLIN, CUDDEBACK, HOGAN, CARDOZO and McLAUGHLIN, JJ., concur.

Judgment of conviction reversed, etc.