■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ERROL PEARCE, Appellant.—Appeal by defendant from a judgment of the Supreme Court, Kings County, rendered June 1, 1976, convicting him of burglary in the second degree and petit larceny, upon a jury verdict, and imposing sentence. Judgment affirmed. No opinion. Gulotta, P. J., Damiani and Hawkins, JJ., concur; O'Connor, J., dissents and votes to reverse the judgment and dismiss the indictment, with the following memorandum: The defendant appeals from a judgment convicting him of burglary in the second degree and petit larceny, following a jury trial. The jury's verdict rests solely upon the testimony of Concepcion Goodin and her sister, Martha Ramirez, both of whom had retired for the night in the apartment they occupied in Brooklyn, New York. Concepcion testified that at about 3:00 A.M. on the hot summer's morning of August 27, 1974, she tossed and turned in her darkened bedroom, unable to fall asleep. In the bathroom there burned brightly a 100-watt bulb; another light illuminated the kitchen. Suddenly Concepcion saw a stranger standing in the bathroom and, as he turned and faced her, she clearly saw his face as he stood in the lighted doorway. He ran past her through the darkened bedroom and into the living room, where her sister Martha was sleeping; he then left the apartment through the front door. Concepcion was persistent in her repeated testimony that she had the culprit under observation for a full two minutes. Martha testified that she too had difficulty falling asleep and that she was still awake when she heard her sister scream. She said that although her room was in total darkness, there was a light in the hallway and she observed the suspect emerge from the bathroom and run through Concepcion's bedroom. She saw his face as he entered the living room, where he pushed her aside; she then observed him exit the front door of the apartment. She said that the entire incident was over in a matter of seconds. Martha telephoned the police and she testified that "The police came and *we* gave them the report." It is thus clear that the statements and descriptions set forth in the police records were supplied by both Concepcion and Martha. For example, their testimony as to the clothing the culprit wore is strikingly similar, almost identical. They agreed that he was Black and Concepcion put it this way: "He had on like a vest. He had on jeans. He had sneakers. He had glasses on, black frames and he had like a printed shirt." She said that the shirt was not light, but was "black with a print on it" and that his rope belt was braided and his vest was white. It is immediately apparent that such a particularized description of the suspect's appearance, if accurate, came from minds that were alert, sharp, quick and keen of perception. But common experience makes it clear that even such a detailed description of clothing, standing alone, is of minimal significance in that it might readily fit with equal accuracy innumerable other individuals whose sartorial tastes and preferences are similar to those of the perpetrator. But then these possessors of sharp and observing minds noted to the police a facial characteristic of the suspect that should, once and for all, distinguish and set apart *this* suspect from many other young, tall Blacks. The perpetrator of *this* crime was Black but, they both agreed, he had a "light complexion." But what is the fact? Does appellant indeed have a "light complexion?" Is his skin in any way of a noticeably light shade, or are we sitting on the edge of another case of mistaken identity? In the record we find that Police Officer Foglia testified, on cross-examination, that the departmental "M. O. report" contains a description supplied by the witnesses as follows: "Male, black, 18,

six foot, 175, black and black, light complexion." The following then transpired: "THE COURT: What is black and black? THE WITNESS: Black hair, black eyes, *complexion light,* blue slacks, black shirt, sneakers and wore glasses. Q Now, what age was that? A *18 years old.* Q Do you know of how old the defendant is? A I would say he was 28 now" (emphasis supplied). Foglia further testified on cross-examination: "Q Is there anything about his appearance, anything unusual that would make you remember his appearance at the time you arrested him, his facial appearance, I mean. A Just that he was dark skinned and very tall. Q Well, would you say that *he is unusually dark skinned?* A *Yes*" (emphasis supplied). The curtain was rung down on this travesty of identification when, two weeks after the crime, Martha, at Concepcion's prompting, joined her sister in exclaiming to Foglia, "That's the guy", or "There's the guy", as they pointed to appellant who was walking along the street. True, he was Black and tall and wore clothing strikingly similar to the original description, even to the braided belt and the glasses with the dark frames, but his skin was still "unusually dark" and he was not at all "light complexioned". In addition to this glaring and totally inexplicable discrepancy, the following conflicts in the testimony are interesting, revealing and important: 1. Despite Concepcion's insistence that she saw appellant for two minutes, Martha conceded that the entire incident lasted only for a matter of seconds. 2. Concepcion, in prior testimony, said that she had seen only the appellant's back. 3. Both witnesses described the culprit as being 18 years old. Appellant was 26 years of age when arrested. 4. Both witnesses testified that they saw the culprit leave through the door of the apartment. Police reports record them as saying they saw him leave, as he had entered, through the kitchen window. 5. Both witnesses testified that they were awake at the time of the crime. They both had previously testified that they were awakened from a sound sleep. 6. No fingerprints were taken at the scene; nor was a lineup ever held. 7. None of the proceeds of the crime, consisting of cash in excess of $100, a watch, earrings and two pairs of expensive eye glasses, were ever found on the appellant, or recovered. The appellant was arrested, indicted, pleaded not guilty and went to trial. He presented alibi testimony which was not seriously challenged by the prosecutor, but which was obviously not accepted by the jury. Nor, apparently, was the jury impressed by appellant's character witnesses. As we analyze the testimony in its totality, we must be ever conscious that there is before us that comparative rarity in the criminal law—a pure identification case in which, other than the eyewitness identification, there is nothing to connect the accused with the crime. The stark horror of convicting the wrong man has forever plagued Bench and Bar alike. The subject has inspired many provocative studies and the vagaries of eyewitness identification are by now well recognized. Experience has taught us that no testimony is more readily and quickly accepted by jurors (why would the witness lie, they ask); by the same token, innumerable tragic cases in the not so distant past clearly establish that it is the least reliable of all classes of evidence, no matter how certain or convincing or honest the witness might be. On the other hand, it is axiomatic that once a witness positively identifies a defendant as the one who committed a crime, the weight to be given the evidence of identification is for the jury. There is one exception of this rule of law: if the testimony of identification is incredible as a matter of law, the indictment must be dismissed *(People v Seppi,* 221 NY 62, 68; cf. *People v Noland,* 27 AD2d 663). Justice suggests, nay demands, that a defendant in a pure identification case be afforded every possible protection against a miscarriage of justice and, to that end,

that he be given the benefit of every reasonable doubt as to the validity and the accuracy of the identification. Here we are not concerned with the usual run-of-the-mill discrepancies that exist in the testimony in many eyewitness cases. For instance, we are not here talking about a variance of inches in height, nor pounds in weight, nor of years in age.* Here we are grievously concerned with the difference between strikingly black and light. After viewing the suspect under strong light, Concepcion said he was "light complexioned", yet it is agreed that the most distinguishing mark of the defendant is that he was "very very dark." Utterly incomprehensible! In my opinion, the verdict here was against the weight of the evidence and is incredible as a matter of law; hence the judgment of conviction should be reversed and the indictment dismissed. Even if the foregoing were not so, it is to be noted that the court's charge to the jury on the defense of alibi was not only contradictory and hence confusing, but was an incorrect statement of law. The court charged: "If the alibi defense raises a reasonable doubt in your mind, then the defendant is entitled to have this evidence treated like any other evidence in the case. On the other hand, if there is no reasonable doubt that defendant was present at the time and place, then you must disallow this evidence." The clear inference is that the alibi defense might only be considered if it raised a reasonable doubt in the minds of the jurors, *and that it could not be considered at all if it failed to raise such a reasonable doubt.* The correct rule is that if the defendant's alibi evidence creates a reasonable doubt, he must be acquitted (see *People v Elmore,* 277 NY 397, 405; *People v Ciprio,* 30 AD2d 956). In this pure identification case, the doctrine of harmless error (see *People v Crimmins,* 36 NY2d 230) should not be invoked and, hence, the charge of the court would require a reversal of the judgment of conviction and the ordering of a new trial. Suozzi, J., concurs in the result reached by Mr. Justice O'Connor.

---

* Although, it is noted, that here there is an eight-year disparity in the age.