THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOSE ORTERO, Also Known as JOSE OTERO, and FRANK NAR-ANJO, Appellants.

Second Department, June 9, 1980

## APPEARANCES OF COUNSEL

*Louis A. Tirelli* for appellants.

*John J. Santucci, District Attorney (Deborah Carlin Stevens* of counsel), for respondent.

## OPINION OF THE COURT

MOLLEN, P. J.

The defendants stand convicted of attempted murder in the second degree and criminal possession of a weapon in the second degree. The prosecution alleged that, acting in concert, they shot Oscar Roldan as he lay in a hospital bed in Booth Memorial Hospital. Roldan, who survived the attack, did not testify at trial. However, another patient at the hospital identified defendant Ortero as Roldan's assailant, and a maintenance worker identified both defendants as the men he had seen running out a back door of the hospital on the day of the crime.

The defendants offered an alibi placing them both at their attorney's office when the crime was committed. The alibi was supported at trial by the testimony of an employee of the attorney, the employee's wife, and two other witnesses.

Prior to trial, defendant Naranjo applied for a ruling pursu-

ant to *People v Sandoval* (34 NY2d 371) to limit the scope of potential cross-examination in the event he testified. His counsel addressed the court as follows: "MR. TIRELLI: Yes, sir. Your Honor, with respect to Frank Naranjo, the only crime in this country that he has been convicted of is one case in the Federal Courts that was before the Honorable Judge Platt, of the Eastern District of New York, which was approximately one year ago. The charge in that case was possession of a weapon, and he took a plea of guilty on the case, and he was sentenced to two years, which he is now presently serving that term. There are no other crimes that he has been convicted of at this time, and I would most respectfully ask that I be able to use Frank Naranjo without the fear of the District Attorney being able to bring out in cross-examination this particular charge, because it would definitely prejudice the jury in a sense that there are guns used in this case, and in that case there was a charge of possession of a weapon."

Noting that he had previously consented to a similar application by the codefendant, the District Attorney said: "I will consent to this charge also, so there need be no further discussion on the point."

At trial, the prosecution called a special agent of the Bureau of Alcohol, Tobacco and Firearms who had participated in Naranjo's arrest. The agent testified that when Naranjo was arrested, he gave a false name and misrepresented his place of birth. The prosecutor then offered for identification a form apparently entitled "Statement of Rights and Waiver of Rights", which Naranjo had signed using a false name. Defense counsel objected and, at a sidebar conference, protested that he had been told by the District Attorney that Naranjo had made no statements to law enforcement officials. Counsel asserted that he had never been furnished with a copy of the "Statement of Rights and Waiver of Rights", and he asked that the form itself be suppressed. The prosecutor replied as follows: "MR. BERLOWITZ: Your Honor, there's an exception to pedigree information. *I have no intentions of going into any of the defendant's criminal background whatsoever. I gave you my assurance before trial.*" (Emphasis supplied.) The court overruled the objection and held the form admissible as "pedigree material."

Defendant Naranjo subsequently testified in his own behalf. On cross-examination he was confronted with serious allegations of misconduct which had not been addressed in the

pretrial *Sandoval* application. At the outset, he was vigorously questioned concerning his entry into and departure from the United States. When defense counsel's objection "to this whole line" of questioning was overruled, Naranjo acknowledged that he had illegally entered the country using an altered passport. Defense counsel thereupon requested a sidebar conference, and the record reveals the following exchange:

"MR. TIRELLI: Your Honor, the only attempt of this testimony is to bring the prejudicial statements to show other previous crimes, and this was not allowed. We had a Sandoval hearing so that this would not be allowed.

"THE COURT: He's never been barred by any sort of a motion. I wouldn't bar any questioning along these lines on the Sandoval motion even if you made it now.

"MR. TIRELLI: But these would—there's no question these are to inflame the jury.

"THE COURT: It goes to his credibility.

"MR. TIRELLI: They still inflame the jury, Your Honor. It goes beyond credibility.

"THE COURT: What do you want to say?

"MR. BERLOWITZ: We had a Sandoval hearing, and I specifically excluded myself from the one conviction which he had in the United States, and I said I wouldn't comment about it, and I intend not to.

"THE COURT: All right.

"MR. TIRELLI: And there was also that there were no charges made in Colombia.

"MR. BERLOWITZ: That's not correct. There was never any mention of that. You're mistaken.

"THE COURT: What about Colombia?

"MR. TIRELLI: About any prior crimes in Colombia.

"THE COURT: He could question him about it if you didn't make it part of your Sandoval motion. I can only deal with matters that are before me.

"MR. TIRELLI: We covered any prior crimes.

"THE COURT: No. You have to be specific. All right.

MR. BERLOWITZ: Thank you."

The prosecutor then pressed his inquiry by eliciting from Naranjo that he had forged certain documents to facilitate his departure from the United States, and had later re-entered

the country illegally. Naranjo's cross-examination concluded as follows:

"Q Isn't it true that on or about October 28th, 1976, you and two others kidnapped Mr. Gustavo Gomez—

"MR. TIRELLI: Objection, Your Honor.

"Q —Zuluaga—

"MR. TIRELLI: Objection, Your Honor.

"THE COURT: Overruled.

"Q —a fifty-five year old owner of a Super Bus Factory, along with an eleven year old boy named Herman Alberto Prieto, and then when you were surrounded by the police, you shot and murdered these two individuals?

"A (In English:) No.

"Q And that this occurred on October 28th, 1976?

"A No.

"Q Isn't it a fact that Mr. Gustavo Gomez Zuluaga was kidnapped from his home, and that the boy was kidnapped while waiting for a bus at 7:00 in the morning, and that you forced the boy into a waiting taxi and took them to a hideaway?

"A No.

"Q Isn't it a fact that as a result of this, you were shot in the leg by the police, and that is the injury of which you speak?

"A No.

"Q And isn't it a fact that when you escaped from the police,—

"MR. TIRELLI: Your Honor, I object.

"THE COURT: Overruled.

"Q —you went to Atlanta, Georgia, and entered this country illegally on December 13th, 1976?

"A That I entered the country, yes.

"Q Illegally on December 13th, 1976?

"A Yes.

"Q Isn't it a fact that also on January 9, 1974, January 9, 1974, or thereabouts, you committed a crime by trafficking in forged currencies in Colombia, South America?

"A No.

"Q And isn't it a fact that on or about September 26, 1975,

you and others kidnapped one Adriana Ortiz Arcelia in Colombia, South America?

"A No.

"MR. BERLOWITZ: Thank you. No further questions."

Out of the hearing of the jury, the court asked the prosecutor to state the factual basis for the questions he had just asked. The prosecutor replied that he had relied on "a composite of various information," including communications with a Colonel Isaza of Colombia, newspaper reports, a "rap-sheet" from two Colombian cities, and unspecified data provided by Inter-Pol.

In summation, the prosecutor made the following remarks which were objected to as indicated:

"Now, Frank Naranjo took the stand, and the defendant came up and told you about the shooting which occurred and which disabled him—something about atrophy. He had a long demonstration. He held up his leg. He took his shoe off and showed his leg, and he was shot. He was shot in Colombia, South America; and you know something about that shooting in Columbia, South America.

"MR. TIRELLI: Objection, Your Honor.

"THE COURT: Overruled.

"MR. BERLOWITZ: And he also indicated to you that he wasn't there. He didn't know where Booth Memorial Hospital was. He indicated that at various times he's used different names. That on April 3, 1976, he used the name entering J.F.K. International Airport of Jose Dario Hernandez-Galan, under altered Passport No. J316339. He claimed to be from Bogota, Colombia, and born April 8, 1945. Well, somebody gave him that passport. That's how he got into this country. He left and then he came back. This time he came in on December 13th, 1976, into Atlanta, and used the alias Augusto Bustamanto. He said he was born in Colombia, on December 11th, 1949. That's not his name or birthdate either. His name is Frank Naranjo; as counsel refers to him—Dr. Frank Naranjo. Well, the good doctor was born on March the 10th, 1950, in Medellin, Colombia; and after that, frankly, the record indicates we don't know anything about him. He's truly a man of mystery.

"MR. TIRELLI: Objection, Your Honor.

"THE COURT: Overruled.

"MR. BERLOWITZ: He has many identities, many birthdates, and many birthplaces.

"I asked him some questions about what went on in Colombia, South America. I asked him about two kidnappings, a forgery,—

"MR. TIRELLI: Objection, Your Honor.

"MR. BERLOWITZ:—and two murders.

"THE COURT: Overruled.

"MR. BERLOWITZ: And they were long detailed questions, and after each question he said no. No, he did not on October 28th, 1976, kidnap Mr. Gustavo Gomez Zuluaga—

"MR. TIRELLI: Your Honor, I object to this. This is not fair summation.

"THE COURT: Sustained. Go on."

■ The jury subsequently convicted both defendants of attempted murder in the second degree and criminal possession of a weapon in the second degree. We now conclude that the convictions of both defendants must be reversed.

The procedure established in *People v Sandoval* (34 NY2d 371, 378, *supra)* requires that, in order to obtain an advance ruling limiting the scope of cross-examination, "the defendant shall inform the court of the prior convictions and misconduct which might unfairly affect him as a witness in his own behalf." (See, also, *People v Duffy,* 36 NY2d 258, 263, cert den 423 US 861; *People v Greer,* 42 NY2d 170, 176.) In the case at bar, defendant Naranjo made a timely pretrial application for *Sandoval* relief but, for reasons which are not entirely clear, he limited the motion to "the only crime in this country that he has been convicted of," viz., the year-old Federal weapons conviction. He made no mention whatever of the immigration violations or of the alleged kidnappings and homicides in Colombia. The court, of course, could not have issued a pretrial protective order with respect to misconduct of which it had no knowledge and which had not been brought to its attention by either side during discussions on the motion. (Cf. *People v Batchelor,* 57 AD2d 1059, 1060-1061; *People v Blim,* 58 AD2d 672.) This does not mean, however, that the court was without power to restrict cross-examination into Naranjo's past.

■ *Sandoval* merely established procedural guidelines and identified relevant criteria for the issuance of a ruling in advance of trial limiting the scope of potential cross-examination of a defendant who testifies in his own behalf. It neither

enlarged nor diminished the court's inherent and pre-existing power to exercise general control over the range of cross-examination permitted during trial. (See *People v Ocasio,* 47 NY2d 55, 57-58; cf. *People v Schwartzman,* 24 NY2d 241, cert den 396 US 846; *People v Sorge,* 301 NY 198, 201-202.) Hence, a defendant who fails to make a sufficiently broad *Sandoval* application will be deprived only of the benefit of an *advance* ruling regarding any prior convictions or misconduct not specified in the motion. He retains the right, however, to object *at trial* to prejudicial cross-examination, and when his objection challenges inquiry into his prior misconduct, he is entitled to a ruling based upon the same criteria as would have been applied had the issue been raised before trial. (See *People v Alamo,* 63 AD2d 6, 8-9; cf. *People v Mackey,* 49 NY2d 274, 282.)

█ Defense counsel here made appropriate contemporaneous objections to the prosecutor's cross-examination, and, in subsequent discussions concerning the immigration violations, the Trial Judge stated that he would not have barred inquiry into those violations even if a request to do so had been made part of the original *Sandoval* application. On the merits, this decision was plainly correct. The immigration offenses, committed through the use of false names, altered passports, and forged documents, were clearly relevant to Naranjo's credibility and were therefore proper subjects for cross-examination. *(People v Sandoval,* 34 NY2d 371, 377, *supra.)*

█ With respect to the allegations of kidnapping and murder, however, the Judge made no corresponding assessment. He merely ruled that inquiry into those incidents would be permitted since no request to preclude such inquiry had been included in the *Sandoval* application. He then summarily overruled all defense objections to questions relating to those allegations. In our view, this summary rejection of Naranjo's challenge was error. (Cf. *People v Mackey, supra.)*

Among the considerations underlying the *Sandoval* holding was a recognition that a defendant's decision as to whether to testify is one of the most fateful he is called upon to make. *(People v Sandoval, supra,* p 375; see, also, *People v Ocasio,* 47 NY2d 55, 58, *supra; People v Davis,* 63 AD2d 948.) Consequently, the Court of Appeals expressed a preference that an appropriate application to limit cross-examination be made prior to trial so that, in deciding whether to testify, the defendant would have "definitive advance knowledge of the

scope of cross-examination as to prior conduct to which he will be subjected". *(People v Sandoval, supra,* p 375.)

Defendant Naranjo was deprived of such "definitive advance knowledge" here because of the deficiency of his own application. Nevertheless, his decision to testify was reached only after the prosecutor had given quick consent to the limited *Sandoval* motion, and had affirmatively represented that he had "no intentions of going into *any of the defendant's criminal background whatsoever."* (Emphasis supplied.) In view of this unequivocal assurance, the court would have been well within its discretion to have held the prosecutor to his promise and precluded him from pursuing his inquiry into Naranjo's prior conduct. (Cf. *People v McNair,* 59 AD2d 787, 788.)

Moreover, on the merits, Naranjo's objections relating to the Colombian incidents merited more than a summary rejection. By their very nature, the allegations of kidnapping and murder carried a strong potential for inflaming the jury. In addition, their similarity to the act for which Naranjo was on trial—attempted murder with a gun—raised a substantial danger that the jury would take the allegations, not so much as reflecting upon Naranjo's credibility, but as proof that he was a murderous individual who would be likely to have committed the crimes charged. And as the Court of Appeals wrote over a half century ago: "Inflexibly the law has set its face against the endeavor to fasten guilt upon [a defendant] by proof of character or experience predisposing to an act of crime." *(People v Zackowitz,* 254 NY 192, 197 [CARDOZO, Ch. J.].) (See, also, *People v Caviness,* 38 NY2d 227; *People v Dickman,* 42 NY2d 294; *People v Davis,* 44 NY2d 269, 274; *People v Allen,* 67 AD2d 558, 560; *People v Johnson,* 64 AD2d 907, 910-911, affd 48 NY2d 674; *People v Jones,* 47 AD2d 761, 762; *People v Santiago,* 47 AD2d 476.)

Moreover, it is not without substantial significance that the allegations relating to the Colombian incidents had not resulted in convictions and remain entirely unproven. It is true, of course, that, as a general rule, a defendant may be cross-examined regarding any criminal, vicious or immoral acts in his past, including those which did not result in a criminal conviction. (See *People v Kennedy,* 47 NY2d 196, 205; *People v Mayrant,* 43 NY2d 236.) Nevertheless, in weighing whether to sustain Naranjo's objections, the court could have properly considered that the highly inflammatory and exceedingly prejudicial allegations in question were untested and were

based solely upon foreign sources of information including newspaper accounts and communications with a South American Colonel whose position and responsibilities were never made clear. (Cf. *People v Myles Corp.,* 53 AD2d 873, 875.)

In our view, then, when Naranjo objected to the cross-examination regarding the Colombian incidents, the court should have interrupted the trial to conduct a further inquiry. First, the court should have attempted to determine the extent to which Naranjo's decision to testify was made in reliance upon the prosecutor's earlier assurances. Second, the court should have afforded Naranjo an opportunity—at a hearing if necessary—to demonstrate "that the prejudicial effect [of permitting such cross-examination] * * * for impeachment purposes would so far outweigh [its] probative worth * * * on the issue of credibility as to warrant its exclusion." *(People v Sandoval,* 34 NY2d 371, 378, *supra.)* The court's failure to conduct such an inquiry was error.

■ Additionally, Naranjo was seriously prejudiced by the prosecutor's closing remarks to the jury. Not only did the Assistant District Attorney violate his previous commitment by inquiring into allegations of prior misconduct in Colombia, but even after those allegations had been categorically denied, he persisted in reminding the jury that Naranjo had offered only one-word negative responses to "long detailed questions" concerning "two kidnappings, a forgery, * * * and two murders." These comments were entirely improper since they could have had no purpose or effect other than to inflame the jury and to prejudice Naranjo by suggesting his propensity to commit the crimes charged. (See *People v Ashwal,* 39 NY2d 105, 109-110; *People v Wright,* 41 NY2d 172; *People v Reyes,* 64 AD2d 657.)

The prosecution did not offer overwhelming proof of guilt in this case. The victim himself was never called to testify, and the People were compelled to rely on identifications based upon brief and stressful encounters. Viewed in this light, the court's summary rejection of Naranjo's challenge to cross-examination into the allegations of kidnapping and murder, coupled with the prosecutor's improper summation, must be judged as having deprived Naranjo of a fair trial. And since the defendants, who are brothers, offered a single alibi defense, the prejudice to Naranjo necessarily affected Ortero as well. We therefore reverse both convictions and order a new trial.

We trust that, since a new trial is required, if both defendants again choose to be represented by the same attorney, the court will make appropriate inquiry into the possibility of a conflict arising out of the joint representation. (See *People v Fioretti,* 49 NY2d 976; *People v Baffi,* 49 NY2d 820; *People v Macerola,* 47 NY2d 257; *People v Gomberg,* 38 NY2d 307.)

LAZER, GIBBONS and MARGETT, JJ., concur.

Two judgments of the Supreme Court, Queens County, both rendered June 15, 1978, reversed, on the law, and new trial ordered.