■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MARK MALPHURS, Appellant. — Appeal by defendant from a judgment of the Supreme Court, Queens County (Balbach, J.), rendered January 11, 1979, convicting him of rape in the first degree and robbery in the first degree, upon a jury verdict, and sentencing him to concurrent, indeterminate terms of imprisonment of 6⅔ to 20 years.

Judgment affirmed.

On July 5, 1977, at approximately 10:30 P.M., two males forcibly entered the complainant's two-door car while it was stopped at a red traffic light. The first male to enter the car from the passenger door held a knife to the complainant's throat while his companion climbed into the back seat. The complainant's purse was handed out of the car to a third male whose face the complainant never saw. After the complainant drove the car for one or two minutes, she was directed to stop. The knife-wielding assailant then ordered her to accompany him into the back seat while his companion climbed into the driver's seat. After a 5- or 10-minute drive, the car came to a stop in a common driveway where the victim was raped by the knife-wielding assailant and her watch taken by the driver. This incident lasted approximately 20 minutes. The rapist then escorted the victim outside the car. When he reentered the vehicle, the perpetrators drove away with her car. Although it was evening, the victim's observation of the perpetrators was aided by the dome light of the car, which illuminated the interior when the two men first entered the vehicle and when she got out of the car. Also, when the car was parked in the common driveway, light filtered through the rear car window from a garage.

On July 15, 1977, the complainant identified defendant as the rapist from a photographic array consisting of six photographs of males similar in age and appearance. Thereafter, the complainant viewed at least 100 projections on a Miraquic computer and identified only defendant's picture. Defendant was apprehended three months later on an unrelated charge and, on October 26, 1977, the complainant identified defendant as the rapist from a six-man lineup conducted at Rikers Island. The participants in the lineup were similar in age and appearance. When asked at the lineup from where she recognized defendant, complainant admitted that she paused before answering the question and stated, in substance, that she wanted to be sure that she recognized defendant from the night of the crime and not the photograph. She stood there until she was sure and then responded: "From the night I was raped. He raped me".

Defendant contends that the complainant's lineup and in-court identifications should have been suppressed as the tainted product of impermissibly suggestive police conduct, i.e., showing the complainant, within a short time period, two pictorial displays, each of which contained defendant's picture. Additionally, defendant argues that the lineup identification should be suppressed because one of the detectives present during the lineup badgered the complainant into responding that she recognized defendant from the night of the rape. With respect to the latter

contention, we do not find the detective's instructions to the victim, that she should not be afraid, that she should take her time and that she would have to disclose from where she recognized the defendant, rose to the level of badgering.

We are cognizant that the danger of misidentification will be increased if the police show a witness pictures of several persons among which the photograph of a single individual resembling the perpetrator recurs. When a misidentification occurs, the witness is apt to retain in his memory the image of the photograph rather than the person actually seen, reducing the trustworthiness of a subsequent lineup or courtroom identification (*Simmons v United States,* 390 US 377, 383-384). However, we conclude that the photographic identification procedures employed here were not "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" (*Simmons v United States, supra,* at p 384). The complainant was sufficiently certain that the photograph of defendant which she selected from the photographic array, without any police prompting, depicted the man who raped her. Defendant does not claim that there was anything distinctive in the makeup of the array to suggest his photograph. Thereafter, she viewed cassettes on a Miraquic computer. The computer projected onto a screen approximately 100 pictures of men in its data bank who had previously been arrested for similar offenses and/or matched the complainant's general description of the perpetrator. The complainant identified only defendant's picture. To be distinguished are situations where the witness tentatively selects more than one photograph of men resembling the perpetrator and, of the chosen photographs, only the defendant's picture is repeated in a second photographic array containing a small number of photographs not previously shown (*see, People v Hall,* 81 AD2d 644; *People v Tindal,* 69 AD2d 58).

Moreover, even if we were of the view that the identification procedures were impermissibly suggestive, it would not require the suppression of the victim's in-court identification. The People established by clear and convincing evidence at the suppression hearing that the proffered in-court identification had an independent origin based on the victim's ample opportunity to observe the rapist in close quarters during the commission of the crime (*see, People v Parks,* 59 AD2d 543).

Defendant next contends that the trial evidence failed to establish the rapist's identity beyond a reasonable doubt. Viewing the evidence in the light most favorable to the People (*People v Lipsky,* 57 NY2d 560, 563; *People v Chamberlain,* 96 AD2d 959, 960), and in consideration of the foregoing discussion, we

find the prosecution made a prima facie showing that the victim's identification testimony was reliable. It was thus within the jury's province to assess the weight to be accorded her testimony (*see, People v Ganci,* 27 NY2d 418, *cert denied* 402 US 924; *People v Seppi,* 221 NY 62, 68; *People v Chamberlain, supra,* at p 960).

We also reject defendant's contention that it was error for the trial court to refuse to conduct a *Sandoval* hearing with respect to the prior vicious and immoral acts intended to be relied upon by the prosecution in impeaching him. In order to obtain an advance ruling limiting the scope of cross-examination, the burden is upon the defendant to inform the court of the prior misconduct which might unfairly affect him as a witness in his own behalf (*see, People v Poole,* 52 AD2d 1010; *People v Ortero,* 75 AD2d 168, 174; *see also, People v Duffy,* 36 NY2d 258, 263, *cert denied* 423 US 861; *People v Sandoval,* 34 NY2d 371, 378). Since defendant refused to disclose any prior vicious or immoral acts, the court correctly declined to furnish an advance ruling as to the admissibility of such acts for purposes of cross-examination. Defendant also asserts that the trial court's ruling that the prosecutor could cross-examine defendant as to his previous use of aliases was erroneous. It would be inappropriate for a trial court to permit the prosecutor to question a defendant concerning his use of aliases on prior occasions unrelated to the crimes charged (*see, People v Jimenez,* 79 AD2d 1012, *mod on other grounds* 55 NY2d 895), especially aliases used in connection with prior convictions barred by the trial court's *Sandoval* ruling (*see, People v Bannerman,* 110 AD2d 706; *People v Evans,* 88 AD2d 604). However, since the arrest report in the instant case noted the defendant's use of an alias in connection with his arrest for raping and robbing the complainant, the trial court's intention undoubtedly was to permit a cross-examination of defendant limited to the alias used in connection with his arrest in this matter. This ruling was not erroneous (*see, People v Colmey,* 117 App Div 462, *affd* 188 NY 573).

Defendant further contends that the trial court erred in refusing to permit him to introduce in evidence Louis Wilson, the man accused of being the second assailant, solely as a physical exhibit rather than to call him as a witness. Defendant additionally argues that the prejudicial effect of disallowing Wilson's use as an exhibit was compounded by the trial court's erroneous ruling that if Wilson intended to invoke his 5th Amendment right against self-incrimination in response to inquiries, as Wilson's counsel had informed the court, Wilson would have to do so in front of the jury. We disagree with defendant's contentions.

In describing her assailants to a police officer shortly after the crime, the complainant had stated, *inter alia,* that the rapist was shorter than the second assailant and that the latter had a mole. To show that the complainant was unreliable as an identification witness, defendant sought to use Wilson as a physical exhibit to allow the jury to observe that Wilson had no mole and was shorter than defendant. A person may be exhibited or inspected where the condition of his body is relevant and material (*see, People v Shields,* 81 AD2d 870, 871; Fisch, NY Evidence § 136 [2d ed]).

Since relevancy must be established (*People v Flanigan,* 174 NY 356, 358), the trial court was justified in requiring proof that Wilson was the man who had been arrested and indicted for the subject offenses. Defense counsel offered to call Detective Gustine as a witness to identify Wilson as the man accused of being the second assailant. However, this offer was unacceptable as Detective Gustine had never arrested Wilson and Gustine's prior testimony indicated a dubious ability to identify Wilson since she had seen Wilson on a prior occasion only from a distance of 20 to 25 feet. Nor could the court compel the prosecutor to enter a stipulation to establish relevance. Since defendant failed to offer proof of relevance in an acceptable form (*cf. People v Shields, supra*), the trial court correctly adhered to its ruling requiring Wilson to take the stand to establish relevance. Consequently, there was no error in permitting the prosecution to elicit the fact Wilson had been charged with the subject offense and was awaiting trial.

Although informed by Wilson's counsel that Wilson would invoke his 5th Amendment privilege in response to any further questions, it was not reversible error to compel Wilson to invoke said privilege in the presence of the jury. Reversible error is not invariably committed whenever a witness claims his privilege not to answer (*Namet v United States,* 373 US 179). Although reversible error is committed when there is a conscious and flagrant attempt by the prosecutor to build its case out of inferences arising from the use of the testimonial privilege or where a witness's refusal to testify adds critical weight to the People's case in a form not subject to cross-examination (*see, Namet v United States,* 373 US 179, 186-187; *United States v Brickey,* 426 F2d 680, *cert denied* 400 US 828; *People v Berg,* 59 NY2d 294, 298), neither of these factors is present in this case. Here, the prosecutor did not call Wilson as a witness nor did he attempt on cross-examination to build a case out of innuendos and inferences of guilt arising from Wilson's invocation of the testimonial privilege by asking a series of questions which

depicted the offense and implicated the defendant (*see, Baker v United States,* 389 F2d 629; *West v State,* 74 Wis 2d 390, 246 NW2d 675; *People v Robinson,* 31 AD2d 724; *cf. Shockley v State,* 335 So 2d 659 [Ala]; *Fletcher v United States,* 332 F2d 724; *United States v King,* 461 F2d 53; *Robbins v Small,* 371 F2d 793, *cert denied* 386 US 1033; *People v Pollock,* 21 NY2d 206; *People v Sifford,* 76 AD2d 937; *People v Paulino,* 60 AD2d 769). Furthermore, in summation, the prosecution did not attempt to capitalize on Wilson's refusal to answer (*see, Baker v United States, supra; cf. United States v Maloney,* 262 F2d 535; *United States v Coppola,* 479 F2d 1153, *later appeal* 526 F2d 764; *People v Pollock, supra*). The prosecutor asked Wilson only two questions: whether Wilson had ever been convicted of a burglary in Queens County on May 9, 1971, and whether Wilson had ever been convicted of any other crimes. No prejudice will generally be presumed to flow from the refusal of the accused's accomplice to answer questions concerning crimes committed by him unrelated to the accused's alleged crime (*see, Propriety and Prejudicial Effect of Prosecution's Calling as Witness, to Extract Claim of Self Incrimination Privilege, One Involved in Offense Charged Against Accused,* Ann., 19 ALR4th 368, § 2 [b]; *State v Nelson,* 65 Wn 2d 189, 396 P2d 540).

The only other question which Wilson refused to answer was asked by defense counsel for the purpose of dispelling any inference that defendant had something to hide by not asking Wilson questions during direct examination. Defense counsel asked Wilson to disclose his whereabouts on the evening of the crime. Wilson's refusal to answer this question did not add "'critical weight'" to the People's case (*West v State, supra,* p 401, p 681, quoting from *Price v State,* 37 Wis 2d 117, 126, 154 NW2d 222, *cert denied* 391 US 908). The main issue in this case was one of mistaken identification. Aside from the complainant's identification of defendant as the rapist and Wilson as the second assailant, no evidence was adduced at trial to establish any relationship or connection between defendant and Wilson. Thus, an inference that Wilson was guilty from his refusal to answer in no way served to implicate defendant (*see, United States v Brickey, supra; cf. People v Pollock, supra; Shockley v State, supra; United States v King, supra; Douglas v Alabama,* 380 US 415). Nor does the Trial Judge's decision to postpone until his charge an instruction to the jury that questions are not evidence mandate reversal under the circumstances of this case (*see, United States v Fleming,* 504 F2d 1045, 1050). Consequently, we conclude that there was no prosecutorial misconduct and Wilson's refusal to testify did not add critical weight to the People's case in a form not subject to cross-examination.

Defendant also contends that he was deprived of a fair trial due to erroneous evidentiary rulings and prosecutorial misconduct.

Attempting to provide an explanation for the five-inch discrepancy in height existing between defendant and the complainant's original description of the rapist, the prosecutor elicited Officer Coughlan's opinion that it is difficult to determine the height of a person who is sitting or lying in a car. The trial court erred in overruling defendant's objection to this opinion evidence (*see generally,* Richardson, Evidence § 361 [Prince 10th ed]). However, the admission of this commonsense opinion was not sufficiently grave to warrant a reversal, especially in view of the officer's admission that the complainant had never told him that it was hard for her to estimate the height of her assailants. It was also error to have admitted, over defendant's objections, his former counsel's opinion that the composition of the lineup was fair. However, we conclude that this error also does not warrant reversal. A photograph of the lineup was admitted into evidence so that the jury could form its own opinion. Furthermore, defendant's contention with respect to the suggestiveness of the lineup did not pertain to the physical characteristics of the men composing said lineup.

Defendant's objection to the receipt of testimony during the prosecutor's redirect examination of Detective Gustine that the slides in the Miraquic computer were of people who have been arrested is without merit. To demonstrate that the complainant's in-court identification of defendant was not trustworthy, defense counsel attempted to prove that the complainant had not made a positive identification from either the photographic array or the Miraquic computer and that she had merely retained in her memory at the time of the lineup identification the image of defendant's photograph rather than that of the actual rapist. Consequently, on cross-examination of Detective Gustine, defense counsel submitted into evidence the photographic array and elicited how the Miraquic computer operates, including the information that the slides are of people who have been arrested. Having opened the door, the redirect testimony of Detective Gustine, which in substance repeated the information first elicited by defendant on cross-examination, is not error and, if error, nonprejudicial in the context of this trial (*see, People v Brown,* 62 AD2d 715, 723-724, *affd* 48 NY2d 921; *see also, People v Parks,* 59 AD2d 543; *People v Kyser,* 52 AD2d 1072).

Defendant's contentions with respect to the propriety of the prosecutor's summation have not been preserved for appellate review as a matter of law (*see,* CPL 470.05 [2]). In any event, we

conclude that the allegedly improper remarks did not serve to deprive defendant of a fair trial (*People v Algerio,* 110 AD2d 706; *People v Hopkins,* 58 NY2d 1079, 1083; *People v Thomas,* 51 NY2d 466, 475). Bracken, J. P., Niehoff, Rubin and Lawrence, JJ., concur.