■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v TYRONE ANDERSON, Appellant.—Appeal by the defendant from a judgment of the Supreme Court, Queens County (Leahy, J.), rendered June 30, 1982, convicting him of murder in the second degree, robbery in the first degree (two counts), and criminal possession of a weapon in the second degree, upon a jury verdict, and imposing consecutive terms of imprisonment

of 25 years to life for murder, 8⅓ to 25 for each count of robbery and 5 to 15 years for weapons possession. The appeal brings up for review the denial, after a hearing (Naro, J.), of those branches of the defendant's omnibus motion which were to suppress a statement and physical evidence.

Justice Bracken has been substituted for the late Justice Gibbons *(see,* 22 NYCRR 670.2 [c]).

Ordered that the judgment is reversed, on the law, and a new trial is ordered.

The defendant's conviction of the crimes of murder in the second degree, robbery in the first degree (two counts) and criminal possession of a weapon in the second degree arose out of the fatal shooting of Francis O'Connor in March 1980.

On the instant appeal, the defendant argues, *inter alia,* that he was deprived of his constitutional right to a trial by an impartial jury. Specifically, the defendant argues that the court improperly restricted his counsel's inquiry of juror No. 1 as well as the remaining jurors, regarding their possible bias against the defendant during a voir dire which was conducted after it was learned that certain jurors had contact with, and had been approached by, certain third parties.

We agree with the defendant's argument.

The trial court learned of the alleged contacts between some of the jurors and third parties from juror No. 6, after the prosecution had rested and before the defense began to present its case. This information triggered an in camera voir dire by the court, prosecutor and defense counsel. During the voir dire, jurors Nos. 6 and 12, in response to questioning by the court, described several encounters between themselves and some of the spectators at the trial, as well as with an individual who identified himself as a cousin of the defendant. The encounters consisted of stares by the spectators, both in an elevator and on the street, and very brief conversation during a lunch recess between juror No. 12 and an individual who identified himself as the defendant's cousin. In the latter encounter, juror No. 12 was asked "what do you think about the case" and he simply answered "I'm not supposed to discuss it".

Despite these encounters, both jurors Nos. 6 and 12, who experienced them directly, and jurors Nos. 1 and 2 who learned of them, assured the court, in response to its queries, that they could still be fair and impartial, and could determine the guilt or innocence of the defendant based on the evidence adduced in court.

After the court concluded its query of juror No. 1, defense counsel asked juror No. 1 if he felt that the defendant had anything to do with the encounters that he heard about. This juror indicated that he would rather not answer the question, and shortly thereafter stated in a similar vein as follows: "I'd rather not say until its time for me to deliberate. I'd rather not say until I hear all the facts in the case. I can't say that he's responsible". Although the court accepted this answer, defense counsel persisted with the following question: "I didn't ask if he could say * * * I want to know would you be able to tell us if you're feeling that Tyrone Anderson [the defendant] is connected in any way, would you be willing to tell me that?" The court sustained the prosecutor's objection to the question, and, during the ensuing colloquy, advised defense counsel that it would sustain an objection by the prosecutor to any similar question if asked of any other juror. In view of this ruling, defense counsel understandably stated, in response to the court's query, that he was not going to insist on questioning any other jurors.

After a short recess, defense counsel moved for a mistrial on the ground that the encounters described by jurors Nos. 6 and 12 could not do the defendant "any good" and "it has to do him harm". The motion was denied.

In *Remmer v United States* (347 US 227), a juror, during the trial, was approached by a stranger, who told the juror that he "could profit by bringing in a verdict favorable to the [defendant]" *(Remmer v United States, supra,* p 228). The trial court consulted with the prosecution and requested that the Federal Bureau of Investigation conduct an investigation. The F.B.I. report concluded that the statement to the juror was made in jest and the court took no further action. The defendant was never told of the incident, and he and his counsel first learned of it in the newspapers, after a guilty verdict had been brought in.

In a motion for a new trial, the defendant argued, *inter alia,* that he had been timely advised of this incident, he would have moved for a mistrial and requested that the juror in question be replaced by an alternate juror. The District Court, without holding a hearing, denied the motion for a new trial. The Circuit Court of Appeals held that the District Court had not abused its discretion by denying the motion, since the defendant had not demonstrated any prejudice.

In reviewing the judgment of the Court of Appeals and remanding for a hearing to determine whether the incident

complained of was harmful to the defendant, the United States Supreme Court stated *(Remmer v United States, supra,* p 229): "In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant."

In contrast, when the approach to the juror does not relate to a "matter pending before the jury" *(Remmer v United States, supra,* p 229), e.g., "laughs, stares [or] rebuffed efforts to start conversations", then " 'there is no right to a new trial absent a showing of prejudice by the defendant' " *(United States v Bufalino,* 576 F2d 446, 451, *cert denied* 439 US 928, quoting from *United States v Brasco,* 516 F2d 816, 819, *cert denied* 423 US 860).

The unauthorized encounters with the jurors in this case consisted primarily of stares and a very cursory conversation, and therefore did not relate to a matter pending before the jury *(see, United States v Bufalino, supra).* However, since the burden was, under these circumstances, on defense counsel to demonstrate prejudice to his client, his inquiry of the particular jurors involved with regard to any possible bias that they had toward the defendant had to be given full latitude *(see, People v Blyden,* 55 NY2d 73, 76; *Smith v Phillips,* 455 US 209, 215). In *United States v Bufalino (supra),* the trial court indicated that it would conduct a voir dire of the jurors who had been exposed to the glares of certain spectators, and counsel voiced no objection. It was only after the trial court's charge that defense counsel asked permission to question the jurors whether they " 'associate the spectators with one [or] more of the defendants and think that through the spectators the defendants may have tried to do something wrong' " *(United States v Bufalino, supra,* p 451, n 7). The trial court rejected the request as untimely, and the defendant, on appeal, argued that he was denied his right to be present at every stage of the trial. The United States Court of Appeals for the Second Circuit rejected the argument on waiver grounds *(United States v Bufalino, supra,* p 450).

In contrast to the facts in *United States v Bufalino (supra),* defense counsel in the case at bar timely exercised his right to

question juror No. 1. Although juror No. 1 told the court that he could render an impartial verdict based solely on the evidence, these words themselves "have no talismatic power to convert a biased juror into an impartial one" *(People v Blyden, supra,* p 78). Indeed, in this case, defense counsel ascertained quite early in his questioning of juror No. 1 that, at the very least, he was somewhat ambivalent about his feelings toward the defendant, in view of the unauthorized encounter between some of the spectators and certain jurors. Nevertheless, the trial court improperly restricted defense counsel from conducting a full inquiry of this juror, and any other jurors, with regard to their possible bias against the defendant as a result of the unauthorized encounters. In so doing, the trial court committed reversible error.

Reversible error was also committed when a prosecution witness, one Andre Warlick, who had originally been a codefendant in this case, was allowed to invoke his privilege against self-incrimination for a second time in front of the jury. It is now well established that a prosecutor who calls a witness to the stand knowing that the witness will invoke his privilege against self-incrimination commits reversible error when it is clear that the prosecutor's motive in calling the witness is to have the jury draw an unwarranted inference against the defendant *(see, People v Berg,* 59 NY2d 294, 298).

The prosecutor, in his opening statement, told the jury that Andre Warlick would testify that he was at the scene of the crime and saw the defendant shoot the decedent. The record establishes that these representations were made by the prosecutor in good faith *(see, People v Berg, supra).* However, just before Warlick was to testify, his attorney advised the court that Warlick, who had testified against the defendant at the Grand Jury and had implicated the defendant during his plea allocution, had a change of heart, that "he didn't want to testify". This change of heart was apparently caused by the fact that Warlick had already been sentenced in accordance with a plea bargain. Defense counsel, upon being advised of this development, told the court: "but if there is any information before the District Attorney or the Court that the—this witness intends to take the fifth amendment I'd like to know about it beforehand so that I can make an application".

In response, the prosecutor stated that he had "no idea whatever as to what the witness will do when he takes the witness stand". The court indicated to defense counsel that the only information it had was based on its sidebar conference with the witness' attorney. Defense counsel then re-

quested that: "if there are any procedures that are going to be used in regard to this witness to get him to testify, such as possible impeachment by prior statements or prior testimony or anything along that line, I wish it would be done outside the presence of the jury". This request was unsuccessful. The witness was then called to the stand by the prosecutor and testified as follows with respect to the following two questions:

"Q Mr. Warlick, do you know the defendant, Tyrone Anderson?

"A I would like to take a plea to the 5th amendment and not answer any questions.

"Q·Will you answer any questions that I put to you?

"A No".

Again, no reversible error was committed by this initial invocation by Warlick of his privilege against self-incrimination since neither the court nor the prosecutor knew for certain that Warlick would invoke the privilege. As the United States Supreme Court stated in *Namet v United States* (373 US 179, 186): "None of the several decisions dealing with this question suggests that reversible error is invariably committed whenever a witness claims his privilege not to answer. Rather, the lower courts have looked to the surrounding circumstances in each case".

However, at a hearing which immediately followed, outside the presence of the jury, Warlick made his intentions quite clear in the following responses to defense counsel's questions, viz.:

"Q Would you please tell the Judge the reason why you took the 5th Amendment today?

"A Because what I might say today might not coincide with what I have said in the past.

"Q Now, when you say what you said in the past, are you referring to your testimony before the Grand Jury; is that part of it?

"A Yes.

"Q And, is it your testimony at the time you took your plea * * * is that right?

"A Yes. * * *

"Q And, the reason why you asked the Judge to take the 5th Amendment today based upon the fact that what you said before the Grand Jury and what you said at the time you took the plea was not true and accurate? * * *

"A Yes.

"Q Are you sure about that?

"A Yes.

"Q And, based upon everything that you've said to the Assistant District Attorney and myself, do you still maintain the position that at the trial of this case, since you don't want to say anything inconsistent with prior sworn testimony, you still wish to take the 5th Amendment at the trial before the jury?

"A Yes."

Nevertheless, the trial court allowed Warlick to be recalled by the prosecution. Warlick then testified as follows:

"Q Mr. Warlick, do you know Tyrone Anderson?

"A I have to take a plea to the fifth amendment.

"THE COURT: All right, the Court rules that the plea to the fifth amendment is without merit under all the facts and circumstances of this case, all the prior proceedings, and the witness is directed to answer.

"THE WITNESS: I take the plea to the fifth amendment."

Defense counsel moved for a mistrial, arguing: "Yesterday, the People called Andre Warlick as a witness, asked two questions. The witness took the fifth amendment to both questions. Today the People recalled Andre Warlick in the presence of the jury asked two questions and he took the fifth amendment to both questions. I think this is highly prejudicial to my client, bringing back a witness who had pleaded the fifth amendment yesterday to have him plead the fifth amendment again in the presence of the jury and on the basis of that I am requesting a mistrial". The motion was denied.

The prosecutor, in calling Andre Warlick a second time, clearly knew that Warlick would invoke his privilege against self-incrimination. The prosecutor thereby manifested an intent to have the jury draw an unwarranted inference against the defendant (see, People v Berg, 59 NY2d 294, supra; see also, People v Lyons, 106 AD2d 471, 472; United States v Maloney, 262 F2d 535). In the absence of prompt curative instructions (cf. People v De Tore, 34 NY2d 199, cert denied sub nom. Wedra v New York, 419 US 1025), the defendant was clearly prejudiced.

This prejudicial error was compounded (1) by the admission of a statement, during the redirect testimony of Michael Keeling, a prosecution witness, who was improperly allowed to testify over an objection by defense counsel based on the ground of hearsay, that Warlick has told him that he was going to testify against the defendant and was "holding a lot

of weight" for the defendant, and (2) during summation, when the prosecutor improperly commented several times on Warlick's invocation of his privilege against self-incrimination (see, *People v Malphurs*, 111 AD2d 266, 271).

Since we are reversing the judgment of conviction and ordering a new trial, we note very briefly, and the People so concede, that the imposition of consecutive sentences in the case at bar was improper, since all of the offenses arose out of a single act (see Penal Law § 70.25 [2]; *People v Torres*, 91 AD2d 1005, 1007, *revd on other grounds* 60 NY2d 119; *People v Terry*, 104 AD2d 572).

We have examined the remaining arguments raised by the defendant and find them to be either without merit or unpreserved for appellate review. Mangano, J. P., Bracken, Kooper and Spatt, JJ., concur.