******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ORLANDO
BERRIOS, JR.
(SC 19494)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Robinson, Js.

*Argued October 16, 2015—officially released January 26, 2016*

*Richard E. Condon, Jr.*, senior assistant public
defender, for the appellant (defendant).

*Rita M. Shair*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Roger Dobris*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ROBINSON, J. This appeal requires us to consider the continuing vitality of the presumption of prejudice in jury tampering cases articulated by the United States Supreme Court in *Remmer* v. *United States*, 347 U.S. 227, 74 S. Ct. 450, 98 L. Ed. 654 (1954) (*Remmer I*), which is a question that has divided state and federal courts for more than thirty years in the wake of *Smith* v. *Phillips*, 455 U.S. 209, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982), and *United States* v. *Olano*, 507 U.S. 725, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993). The defendant, Orlando Berrios, Jr., appeals[1] from the judgment of the trial court convicting him, following a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4). On appeal, the defendant claims that the trial court improperly denied his motion for a mistrial on the ground that his mother[2] had tampered with the jury by approaching a juror outside the courthouse and speaking to him about the evidence in this case. Relying on the presumption of prejudice articulated in *Remmer I* (*Remmer* presumption), the defendant contends that his mother's jury tampering violated his constitutional right to a fair trial because the state failed to carry its " 'heavy burden' " of proving that her actions did not affect the jury's impartiality. Although we conclude that the *Remmer* presumption remains good law in cases of external interference with the jury's deliberative process via private communication, contact, or tampering with jurors about the pending matter, we also conclude that the state proved that there was no reasonable possibility that the actions of the defendant's mother affected the jury's ability to decide this case fairly and impartially. Accordingly, we affirm the judgment of the trial court.

The record reveals the following background facts, which the jury reasonably could have found, and procedural history. On December 4, 2011, at approximately 7:20 a.m., the defendant and another man, Bernard Gardner, were driving in a black Hyundai Santa Fe (car) on Cedar Street in the city of New Haven when they came upon the victim, Javier Ristorucci, who was out for a walk. The defendant stopped and exited the car, and while Gardner watched, robbed the victim at gunpoint. The victim gave the defendant his cell phone, cash, and the gray hooded sweatshirt and black jacket that he was wearing at the time. After being flagged down by Leonardo Ayala, a friend of the victim who had just left the scene, Francisco Ortiz, an officer in the New Haven Police Department, saw the car stopped in the middle of the street with its brake lights on; the defendant was sitting in the driver's seat smoking crack. The victim then told Ortiz that a man in the car with a gun had robbed him.

When Ortiz attempted to stop the car, the defendant drove away, causing a high speed pursuit through the

streets of New Haven onto Interstate 91, which ended when the car came to a rest against the guardrail near exit 11 in North Haven. After a brief foot pursuit, Ortiz and several other police officers apprehended the defendant, who had been driving the car. In the meantime, other police officers apprehended Gardner, who was pinned against the highway guardrail in the passenger seat. Following a showup identification, the victim identified the defendant by his hat, clothing, and face as the person who had robbed him. Ortiz found the victim's gray sweatshirt and black jacket when he searched the car; the gun, cash, and cell phone were not recovered.

The state charged the defendant with robbery in the first degree in violation of § 53a-134 (a) (4), and the case was tried to a jury. During trial, a juror, J,[3] informed the trial court that the defendant's mother had approached him on the street outside the courthouse and commented on the veracity of one of the witnesses. Following voir dire of J and the rest of the jurors, the defendant moved for a mistrial on the ground of jury tampering. The trial court denied that motion. The jury subsequently returned a verdict finding the defendant guilty of robbery in the first degree. The trial court rendered a judgment of guilty in accordance with the jury's verdict, and sentenced the defendant to a total effective sentence of fifteen years imprisonment, followed by five years of special parole. This appeal followed.

The record reveals the following additional facts and procedural history relevant to the defendant's claim that the trial court abused its discretion in denying his motion for a mistrial on the ground that the jury's impartiality had been compromised by jury tampering. On the third day of evidence, the clerk informed the trial court that J had reported to the clerk that the defendant's mother had approached him "and some communication had occurred." The trial court then read a note from J in which he stated that he had been "approached by the defendant's mother in the parking lot yesterday . . . [at] approximately 3:30 p.m. She attempted to engage me in conversation. I did not respond to her comments." The trial court then questioned J in open court about the note and he stated: "I guess [the defendant's mother] was concerned for which way we were leaning and [she] was asking me if I . . . realized that that last cop was lying. And I made no comment to her and I told her [to] be careful of the gateway that we were walking over so she didn't trip, and I said have a nice evening. So, that was the total."[4] J further testified that he had informed the rest of the jury about that encounter while he was preparing the note. J assured the trial court that his ability to decide the case based solely on the evidence had not been compromised as a result of the encounter.[5]

In response to voir dire questions from the defendant, J testified that he did not tell any friends or family what had happened, and had informed only the other jurors. When asked whether the conversation would affect his ability to "continu[e] to be fair and impartial to the state and to the defendant," J responded, "[n]o, not at all." J further testified that he viewed the actions of the defendant's mother as those of "a concerned mother." When asked whether he would "decide this case based on anything that happened yesterday [at] about 3:30 [p.m.] outside of this courtroom," J responded, "[n]o." J also testified that he had learned from the other jurors that one juror, E, had witnessed the encounter with the defendant's mother.

Before questioning the other jurors, the trial court excluded the defendant's mother from the courtroom. E then testified that, while stopped on his bicycle at the intersection of Orange and Grove Streets, he saw a woman, who he recognized from the courtroom, approach J from behind while talking. E further testified that he did not see or hear J communicate with her. E also testified, in response to questions from the trial court and the defendant, that the incident would not affect his ability to decide the case based solely on the evidence presented in court.

Having interviewed the two witnesses to the incident, the trial court then summoned the remaining members of the jury for individual questioning.[6] The next juror, M, testified that J had told the other members of the jury that "he was approached by the defendant's mother, but he didn't say anything, he just walked off." When asked by the trial court whether she would "decide [the] case based 100 percent on the evidence," M responded, "[y]es." M offered a similar assurance in response to questions from the defendant, agreeing that what she heard from J had not affected her ability to be "fair and impartial in this matter," and that her impartiality remained the "[s]ame as it was when [she was] sworn in . . . ."

Another juror, S, testified that J had said "he was approached by the defendant's [mother]." S stated that she "believe[d]" J had spoken about "two young ladies behind him" at that time "with cell phones and [J] wasn't . . . sure whether he was being taped or not, so he needed to tell [the trial court]." S similarly assured the trial court that her ability to discharge her sworn duty to decide the case impartially "based 100 percent on the evidence in court" had not been compromised. In response to further questions from the defendant, S stated that J "wasn't sure" about being recorded because the two young women "had cell phones out, so he wasn't sure whether he was being taped, you know, for a mistrial, he wasn't sure, so he wanted to tell the [trial court] because he wasn't sure about being taped or not. He saw the two young ladies, I guess,

with cell phones, and he wanted to tell it just in case."[7] When asked by defense counsel whether anything had "changed since the day [she was] sworn in" with respect to her ability to decide the case fairly in accord with her oath, S responded, "[n]o."

Another juror, D, testified that she wrote the note for J at his request after he told the other members of the jury that "he had been approached by [who] he believed to be the defendant's mother in the parking lot and that he didn't engage in conversation with her." D testified, in response to questions from the defendant, that, being an educator, she wrote the note for J because "[h]e [had] expressed that his writing skills were not as good as he hoped them to be." D stated that J had been "fairly vague in his sharing" and had not provided any "details or anything to that nature. It was merely that he had been approached and he didn't respond, and that was essentially the end of it." When asked by the trial court whether she could keep an open mind and "decide the case based fairly and squarely 100 percent on the evidence in court," D responded in the affirmative.

The final juror, L testified that J had "said that he was approached by a person that he figured was the mother of the defendant, and that he did not pay attention to what she said, and did not respond to anything she said, he did not report to us what she said. And [J] said that his only concern was that somebody might be watching the encounter and videotaping it so that they could sort of say, hey, look, the jury has been tampered with and call for a mistrial, that was his concern, and that is why he wanted to report it . . . ." When asked by the trial court whether his ability to decide the case "based 100 percent on the evidence presented in court" had been compromised, L responded, "I don't think so at all." When asked whether he would "continue to be open-minded and fair and decide this case based exclusively on the evidence presented in court," L responded, "absolutely."[8] L further explained, in response to questioning by defense counsel, that J did not explain his understanding of the terms "tampering" or "mistrial" in expressing his concerns to the other jurors, that L believed that the defendant's mother "must be very upset and very concerned" about this case, and that J appeared concerned about the effect of the encounter. L stated that he had not discussed anything else about the case with the other jurors.

The defendant then moved for a mistrial. He argued that a mistrial was "in the interest of justice" because the other jurors' voir dire testimony indicated that J had not been completely forthcoming with the details about his encounter with the defendant's mother, in particular, his failure to inform the trial court about the presence of the two young women who might have recorded the encounter with their cell phones, and his

use of legal terminology such as "mistrial" in explaining his concerns to the other members of the jury. The trial court denied the defendant's motion, stating that "the idea that the defendant's mother can approach a member of the jury with this kind of communication and then the defendant can get a mistrial out of this is just outrageous. It's outrageous. Obviously, if the jury had, in fact, been contaminated, then that would be another story, but the court and counsel have interviewed each of the six members of the jury and it's very apparent that they are very fair and they are very committed to deciding this case based 100 percent on what is said in court, on the evidence presented in court."[9] The trial court then excluded the defendant's mother from the courtroom for the remainder of the trial, noting that any prosecution decisions with respect to her conduct lay with the state.

Before turning to the defendant's specific claims on appeal, we note the following general principles. "We begin with the standard of review that governs this case. In our review of the denial of a motion for mistrial, we have recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Anderson*, 255 Conn. 425, 435, 773 A.2d 287 (2001).

"Potential juror bias is considered akin to other misconduct that similarly might affect a juror's impartiality, thus potentially violating a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, § 8, and by the sixth amendment to the United States constitution." (Internal quotation marks omitted.) *State* v. *Osimanti*, 299 Conn. 1, 32, 6 A.3d 790 (2010); see also, e.g., *State* v. *Brown*, 235 Conn. 502, 522, 668 A.2d 1288 (1995). Judicial inquiry into jury tampering is governed by the same standards as other possible instances of jury bias. See, e.g., *State* v. *Dixon*, 318 Conn. 495, 507, 122 A.3d 542 (2015). Thus, "[w]ith respect to allegations that a juror potentially may be biased, [e]ven where a juror has formed some preconceived opinion as to the guilt of an accused, a juror is sufficiently impartial if he or she can set aside that opinion and render a verdict based on evidence in the case. . . . Only where a juror has indicated a refusal to consider testimony and displayed evidence of a closed mind concerning [the] defendant's innocence can it be said that [the court] abused its discretion in refusing to [remove] a juror [from the panel]. . . . It is enough if a juror is able to set aside any preconceived notions and decide the case on the evidence presented and the instructions given by the court. . . . While we recognize that a juror's assurances that he or she is equal to the task are not dispositive of the rights of an accused

. . . we are aware of the broad discretion of a trial judge which includes his determination of the credibility to be given a juror's statement in this context. . . .

"The trial court's assessment of the juror's assurances, while entitled to deference, must be realistic and informed by inquiries adequate in the context of the case to ascertain the nature and import of any potential juror bias. . . . The inquiry need not, however, be lengthy, so long as the questions, viewed in the context of the juror's answers, are adequate for the trial court to determine that the juror can indeed serve fairly and impartially. . . . The nature and quality of the juror's assurances is of paramount importance; the juror must be unequivocal about his or her ability to be fair and impartial." (Internal quotation marks omitted.) Id.

In this appeal, the defendant contends that: (1) under *Remmer I*, supra, 347 U.S. 229, jury tampering in the form of a communication to a juror by a third party, here, his mother, was presumptively prejudicial; and (2) the record demonstrates that the state failed to carry its " 'heavy burden' " of proving that the jury tampering did not lead to the "reasonable possibility that [J] or any juror 'was . . . affected in his freedom of action as a juror.' "[10] We address each claim in turn.

I

We begin with the defendant's claim that the presumption of prejudice articulated in *Remmer I*, supra, 347 U.S. 229, continues to apply in cases concerning jury tampering, thus shifting the burden to the state to prove that there was no reasonable possibility that any juror was "affected in his [or her] freedom of action as a juror." *Remmer* v. *United States*, 350 U.S. 377, 381, 76 S. Ct. 425, 100 L. Ed. 435 (1956) (*Remmer II*). Acknowledging an apparent inconsistency in our case law on this point; see, e.g., *State* v. *Osimanti*, supra, 299 Conn. 38–39 n.32; the defendant also notes a split among federal Circuit Courts about whether the *Remmer* presumption remains good law in light of the Supreme Court's subsequent decisions in *Smith* v. *Phillips*, supra, 455 U.S. 209, and *United States* v. *Olano*, supra, 507 U.S. 725. The defendant then urges us to follow the vast majority of the federal Circuit Courts, which continue to employ the *Remmer* presumption in cases of significant jury misconduct, including tampering, thus requiring the state to prove harmlessness at an evidentiary hearing. Relying on *United States* v. *Dutkel*, 192 F.3d 893, 895–96 (9th Cir. 1999), the defendant emphasizes that the presumption is particularly applicable in cases concerning jury tampering, which is a "serious intrusion into the jury's processes and poses an inherently greater risk to the integrity of the verdict," because tampering is an act likely to give rise to resentment of the defendant by the jurors.

In response, the state relies on the line of this court's

cases cited in *State* v. *Rhodes*, 248 Conn. 39, 48, 726 A.2d 513 (1999), which follow *Smith* v. *Phillips*, supra, 455 U.S. 215, for the proposition that, under *Remmer I*, supra, 347 U.S. 229, claims of juror misconduct require only "a hearing where the focus of the inquiry must be whether the intrusion affected the jury's deliberation and thereby its verdict." This line of cases places the burden on the defendant to prove that: (1) misconduct occurred; and (2) that misconduct resulted in actual prejudice.[11] We, however, agree with the defendant that the *Remmer* presumption remains good law and was triggered once the trial court determined that jury tampering had occurred in this case, thus requiring the state to prove that there was no reasonable possibility that the tampering affected the impartiality of the jury.

We begin by reviewing the trilogy of United States Supreme Court cases giving rise to this issue on appeal, namely, *Remmer I*, supra, 347 U.S. 227, *Smith* v. *Phillips*, supra, 455 U.S. 209, and *United States* v. *Olano*, supra, 507 U.S. 725. In *Remmer I*, supra, 228, the defendant was convicted by a jury of several counts of tax evasion. After the trial, the defendant and his attorneys learned from a newspaper article that the trial judge and the prosecutors had acted ex parte to have the Federal Bureau of Investigation (FBI) investigate the potential offer of a bribe to a juror, and then did nothing further after the FBI determined that the offer had been made in jest. Id. The Supreme Court held that the District Court improperly failed to afford the defendant a hearing with respect to the potential jury tampering, stating that: "In a criminal case, *any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial*, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. *The presumption is not conclusive, but the burden rests heavily upon the [g]overnment to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant*." (Emphasis added.) Id., 229. Accordingly, the Supreme Court remanded the case to the District Court for a hearing to "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial . . . ."[12] Id., 229–30.

We next turn to *Smith* v. *Phillips*, supra, 455 U.S. 212, which arose from a federal habeas corpus petition claiming that the petitioner had been deprived of a fair trial by the fact that one of jurors had, at the time of the trial, an application pending for employment as an investigator with the Office of the District Attorney that was prosecuting him. Although the trial prosecutors became aware of the juror's pending employment application, they did not inform the petitioner or the trial court of that fact until after the trial ended with a guilty

verdict. Id., 212–13. After a hearing, the state trial court found that the juror's application " 'was indeed an indiscretion' but that it 'in no way reflected a premature conclusion as to the [habeas petitioner's] guilt, or prejudice against [him], or an inability to consider the guilt or innocence of the [habeas petitioner] solely on the evidence.' " Id., 213–14. In holding that the petitioner was not entitled to a new trial, the Supreme Court cited *Remmer I*, supra, 347 U.S. 229, as illustrative of the proposition that it "has long held that the remedy for allegations of juror partiality is a hearing *in which the defendant has the opportunity to prove actual bias*,"[13] and the court stated that *Remmer I* "recognized the seriousness not only of the attempted bribe, which it characterized as 'presumptively prejudicial,' but also of the undisclosed investigation," but nevertheless "did not require a new trial like that ordered in this case. Rather, the [Supreme] Court instructed the trial judge to 'determine the circumstances, the impact thereof upon the juror, and whether or not [they were] prejudicial, in a hearing with all interested parties permitted to participate.' . . . *In other words, the* [*Supreme*] *Court ordered precisely the remedy which was accorded by* [*the state court*] *in this case*."[14] (Citation omitted; emphasis altered.) *Smith* v. *Phillips*, supra, 215–16.

The final case in this trilogy is *United States* v. *Olano*, supra, 507 U.S. 737, wherein the Supreme Court concluded that the presence of alternate jurors during jury deliberations, in violation of rule 24 (c) of the Federal Rules of Criminal Procedure, was "not the kind of error that 'affect[s] substantial rights,' " and, thus, did not require reversal under the federal plain error rule. See Fed. R. Crim. P. 52 (b). In so concluding, the Supreme Court observed that "[w]e generally have analyzed outside intrusions upon the jury for prejudicial impact," describing *Remmer I*, supra, 347 U.S. 227, as a "prime example," and citing *Smith* v. *Phillips*, supra, 455 U.S. 217, for a "summar[y]" of the court's " 'intrusion' jurisprudence," particularly the proposition that " '[d]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation.' " *United States* v. *Olano*, supra, 738. In *Olano*, the Supreme Court stated that "[t]here may be cases where an intrusion should be presumed prejudicial . . . but a presumption of prejudice as opposed to a specific analysis does not change the ultimate inquiry: Did the intrusion affect the jury's deliberations and thereby its verdict?" (Citations omitted.) Id., 739; see also id. ("[w]e cannot imagine why egregious comments by a bailiff to a juror [*Parker* v. *Gladden*, 385 U.S. 363, 87 S. Ct. 468, 17 L. Ed. 2d 420 [1966] or an apparent bribe followed by an official investigation [*Remmer I*, supra, 277] should be evaluated in terms of 'prejudice,' while the mere presence of alternate jurors during jury deliberations should not" [emphasis omitted]). In *Olano*, the Supreme Court held that the presence of the alternate jurors did

not require reversal under the federal plain error rule because, although the alternates might "[i]n theory . . . prejudice a defendant" by " 'chilling' " deliberations or improperly participating therein, there was no evidence on the record that they did so, particularly given the presumption that they would have followed the trial judge's instruction not to participate. *United States* v. *Olano*, supra, 739–41. The court also stated that it did not "think that the mere presence of alternate jurors entailed a sufficient risk of 'chill' to justify a presumption of prejudice . . . ." Id., 741; see also id. ("[w]hether the [g]overnment could have met its burden of showing the absence of prejudice . . . if [the] respondents had not forfeited their claim of error, is not at issue here").

The Supreme Court's decisions in *Phillips* and *Olano* created a great deal of uncertainty with respect to the continuing viability of the *Remmer* presumption, leading to a split among the federal Circuit Courts nationally, and to inconsistencies in our own case law. This conflict was brought to the fore locally in *State* v. *Rhodes*, supra, 248 Conn. 40, wherein the defendant sought a new trial on the ground of juror misconduct, namely, multiple conversations about the trial between a juror and her incarcerated boyfriend. The defendant in *Rhodes* argued that, under *Remmer I* and *State* v. *Rodriguez*, 210 Conn. 315, 325–26, 554 A.2d 1080 (1989), the federal due process clause "requires the state to establish the harmlessness of any juror misconduct beyond a reasonable doubt."[15] *State* v. *Rhodes*, supra, 48. In so arguing, the defendant invited the court to "reconsider our precedent that places the burden on the defendant to show that he or she was actually prejudiced by the juror misconduct when the trial court is in no way responsible for the impropriety."[16] Id.; see, e.g., *State* v. *Newsome*, 238 Conn. 588, 628, 682 A.2d 972 (1996); *Asherman* v. *State*, 202 Conn. 429, 442, 521 A.2d 578 (1987). In response, the state relied on *Smith* v. *Phillips*, supra, 455 U.S. 215, for the proposition that "more recently, the United States Supreme Court has indicated that [*Remmer I*] stands only for the proposition that a defendant is entitled to a hearing at which the defendant bears the burden of proving actual prejudice." *State* v. *Rhodes*, supra, 49; see also id., 49–50 n.16 (describing circuit split on this issue). This court, however, declined "to revisit [its] prior case law regarding the burden or standard of proof in juror misconduct cases because the defendant cannot prevail, even under the rule he urges us to adopt." Id., 50. We subsequently declined similar invitations to address this issue in two recent cases. See *State* v. *Dixon*, supra, 318 Conn. 507–508; *State* v. *Osimanti*, supra, 299 Conn. 38–39 n.32; see also *State* v. *Walker*, 80 Conn. App. 542, 557 and n.8, 835 A.2d 1058 (2003) (discussing *Rhodes* and collecting cases), cert. denied, 268 Conn. 902, 845 A.2d 406 (2004).

In resolving this conflict in our case law, we review

other jurisdictions' approaches to the continuing viability of the *Remmer* presumption in light of *Phillips* and *Olano*. Three federal Circuit Courts, namely, the United States Courts of Appeals for the Sixth, Fifth, and District of Columbia Circuits, hold that the *Remmer* presumption has been significantly modified or overruled. The Sixth Circuit takes the most extreme position, concluding that the *Remmer* presumption is a completely dead letter because *Smith* v. *Phillips*, supra, 455 U.S. 215, stands for the proposition that "[*Remmer I*] does not govern the question of the burden of proof where potential jury partiality is alleged. Instead, [*Remmer I*] only controls the question of how the [D]istrict [C]ourt should proceed where such allegations are made, i.e., a hearing must be held during which the defendant is entitled to be heard. . . . In light of *Phillips*, the burden of proof rests upon a defendant to demonstrate that unauthorized communications with jurors resulted in actual juror partiality. Prejudice is not to be presumed."[17] (Citation omitted.) *United States* v. *Pennell*, 737 F.2d 521, 532 (6th Cir. 1984), cert. denied, 469 U.S. 1158, 105 S. Ct. 906, 83 L. Ed. 2d 921 (1985); see also, e.g., *United States* v. *Orlando*, 281 F.3d 586, 597–98 (6th Cir.) (reaching same conclusion), cert. denied sub nom. *Daniels* v. *United States*, 537 U.S. 947, 123 S. Ct. 411, 154 L. Ed. 2d 290 (2002). The Fifth Circuit does not take such an extreme approach, but nonetheless has significantly circumscribed the *Remmer* presumption within its borders, stating that it "cannot survive *Phillips* and *Olano*," and that its use is a discretionary decision for the trial court, upon a showing of sufficient prejudice.[18] *United States* v. *Sylvester*, 143 F.3d 923, 934 (5th Cir. 1998). The District of Columbia Circuit Court of Appeals has adopted a similar approach. See *United States* v. *Williams-Davis*, 90 F.3d 490, 495–97 (D.C. Cir. 1996) (observing that *Phillips* and *Olano* "narrow[ed]" *Remmer I*, thus affording trial court discretion to determine whether "any particular intrusion showed enough of a likelihood of prejudice to justify assigning the government a burden of proving harmlessness" in case concerning encouragement from juror's husband to "nail" defendant [internal quotation marks omitted]), cert. denied, 519 U.S. 1128, 117 S. Ct. 986, 136 L. Ed. 2d 867 (1997).

In our view, these courts' understanding of *Phillips* to alter or eviscerate the *Remmer* presumption is wholly inconsistent with the context of the *Phillips* opinion and well established norms for the reading of judicial opinions. As aptly noted by the United States Court of Appeals for the Fourth Circuit in *United States* v. *Lawson*, 677 F.3d 629, 642 (4th Cir.), cert. denied sub nom. *Gibert* v. *United States*,     U.S.    , 133 S. Ct. 393, 184 L. Ed. 2d 162 (2012), *Phillips* is factually and procedurally distinct from *Remmer I*. Factually, *Phillips* concerned juror impairment or predisposition, rather than third-party jury tampering or extrinsic influ-

ences on the jury, and legally, *Phillips* was a federal habeas corpus review of a state court proceeding rather than direct appellate review of a trial court's actions. See *Smith* v. *Phillips*, supra, 455 U.S. 215–18. Moreover, although the Supreme Court stated in *Phillips* that "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias" it did so after acknowledging the *Remmer* presumption and citing *Remmer I* approvingly as requiring only a hearing, rather than a new trial, as a remedy for claims of improper juror influence. Id., 215–17. Nothing at issue before the Supreme Court in *Phillips* concerned the allocation of the burden of proof or production at such hearings. Indeed, to read *Phillips* as categorically eliminating the *Remmer* presumption is inconsistent with the Supreme Court's later recognition that "[t]here may be cases where an intrusion should be presumed prejudicial . . . ." (Citations omitted; emphasis added.) *United States* v. *Olano*, supra, 507 U.S. 739.

Particularly given its factually and legally inapposite nature, interpreting the Supreme Court's absolute silence on this point in *Phillips* as categorically eliminating the *Remmer* presumption contravenes the well established maxim that, "absent clear indications from the Supreme Court itself, lower courts should not lightly assume that a prior decision has been overruled sub silentio merely because its reasoning and result appear inconsistent with later cases." *Williams* v. *Whitley*, 994 F.2d 226, 235 (5th Cir.), cert. denied, 510 U.S. 1014, 114 S. Ct. 608, 126 L. Ed. 2d 572 (1993); see also, e.g., *Shalala* v. *Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 18, 120 S. Ct. 1084, 146 L. Ed. 2d 1 (2000) (Supreme Court "does not normally overturn, or so dramatically limit, earlier authority sub silentio"); *United States* v. *Mitchell*, 690 F.3d 137, 143–45 (3d Cir. 2012) (concluding that, despite some courts' determinations to contrary, silence in *Phillips* did not foreclose use of implied bias doctrine because conclusion otherwise would have "Supreme Court abandon a centuries-old doctrine sub silentio").

Indeed, the majority of the federal Circuit Courts hold that the *Remmer* presumption is still good law with respect to egregious external interference with the jury's deliberative process via private communication, contact, or tampering with jurors about the matter. In particular, we observe that the United States Court of Appeals for the Second Circuit[19] has consistently followed *Remmer I* and considers it "well-settled that any extra-record information of which a juror becomes aware is presumed prejudicial. . . . A government showing that the information is harmless will overcome this presumption."[20] (Citation omitted.) *United States* v. *Greer*, 285 F.3d 158, 173 (2d Cir. 2002); see also, e.g., *United States* v. *Farhane*, 634 F.3d 127, 168–69 (2d Cir.) (government rebutted *Remmer* presumption in case

arising from juror's Google search that revealed code-fendant's guilty plea), cert. denied sub nom. *Sabir* v. *United States*, U.S. , 132 S. Ct. 833, 181 L. Ed. 2d 542 (2011); *United States* v. *Weiss*, 752 F.2d 777, 782–83 (2d Cir.) (government rebutted *Remmer* presumption with respect to contamination allegations arising from juror bringing accounting textbook excerpt into deliberations), cert. denied, 474 U.S. 944, 106 S. Ct. 308, 88 L. Ed. 2d 285 (1985); but see *United States* v. *Morrison*, 580 Fed. Appx. 20, 21 n.1 (2d Cir. 2014) (summary order noting that government conceded applicability of *Remmer* presumption and declining to address circuit split "[b]ecause that issue has not been presented").

Similarly, the Fourth Circuit holds that "once a defendant introduces evidence that there was an extrajudicial communication that was more than innocuous, the *Remmer* presumption is triggered automatically, and [t]he burden then shifts to the [government] to prove that there exists no reasonable possibility that the jury's verdict was influenced by an improper communication." (Internal quotation marks omitted.) *United States* v. *Lawson*, supra, 677 F.3d 642; see also id., 641–43 (discussing circuit cases holding *Remmer* presumption applicable in cases concerning attempts to bribe jurors, comments made by restaurant owner to dining jurors about case, and juror's contact of media outlets during penalty phase of capital trial, in applying presumption to juror's unauthorized use of Internet encyclopedia during deliberations).

The United States Courts of Appeals for the First, Third, Seventh, Eighth, Ninth, and Tenth Circuits accord with the approaches of the Second and Fourth Circuits with respect to serious, or not "innocuous" claims of external influence, such as jury tampering, bribery, or use of extra-record evidence.[21] See, e.g., *Stouffer* v. *Trammell*, 738 F.3d 1205, 1214 n.5 (10th Cir. 2013); *United States* v. *Honken*, 541 F.3d 1146, 1167 (8th Cir. 2008), cert. denied, 558 U.S. 1091, 130 S. Ct. 1011, 175 L. Ed. 2d 618 (2009); *United States* v. *Al-Shahin*, 474 F.3d 941, 949 (7th Cir. 2007); *United States* v. *Rutherford*, 371 F.3d 634, 643 (9th Cir. 2004); *United States* v. *Lloyd*, 269 F.3d 228, 238–39 (3d Cir. 2001); *United States* v. *Boylan*, 898 F.2d 230, 261 (1st Cir.), cert. denied, 498 U.S. 849, 111 S. Ct. 139, 112 L. Ed. 2d 106 (1990); see also *United States* v. *Tejeda*, 481 F.3d 44, 48–52 (1st Cir.) (declining to apply *Remmer* presumption when older man, later identified to be defendant's grandfather, made throat-slitting gesture in courtroom that was witnessed by two jurors because gesture did not pertain to evidence in case and court did "not want to create an incentive for such gesturing" by individuals associated with criminal defendants), cert. denied, 552 U.S. 1021, 128 S. Ct. 612, 169 L. Ed. 2d 393 (2007); *United States* v. *Boylan*, supra, 261 (limiting applicability of *Remmer* presumption "to cases of significant ex parte contacts with sitting jurors or those involving aggra-

vated circumstances").

Finally, many of our sister states that have considered the issue[22] hold that the *Remmer* presumption remains good law in addressing claims of extrajudicial communications or jury tampering.[23] See *State* v. *Miller*, 178 Ariz. 555, 559 n.2, 875 P.2d 788 (1994); *People* v. *Runge*, 234 Ill. 2d 68, 103–104, 917 N.E.2d 940 (2009), cert. denied, 559 U.S. 1108, 130 S. Ct. 2402, 176 L. Ed. 2d 925 (2010); *Ramirez* v. *State*, 7 N.E.3d 933, 936–38 (Ind. 2014); *Jenkins* v. *State*, 375 Md. 284, 317–19, 825 A.2d 1008 (2003); *Meyer* v. *State*, 119 Nev. 554, 564–65, 80 P.3d 447 (2003); *Trice* v. *Baldwin*, 140 Or. App. 300, 304–306, 915 P.2d 456 (1996); see also *Hill* v. *United States*, 622 A.2d 680, 684 (D.C. 1993) ("[W]here, following a hearing, the defendant has established a substantial likelihood of actual prejudice from the unauthorized contact . . . all reasonable doubts [about the juror's ability to render an impartial verdict must] be resolved in favor of the accused. . . . In this sense [the] allocation of the burden [of proving harmlessness to the government in *Remmer I*] remains the law . . . ." [Citations omitted; internal quotation marks omitted.]); *Greer* v. *Thompson*, 281 Ga. 419, 421, 637 S.E.2d 698 (2006) (questions continued viability of *Remmer* presumption, but notes similar presumption as matter of state criminal procedure with respect to unauthorized communication to juror).

Having considered these authorities in light of our reading of the United States Supreme Court opinions, we conclude that the *Remmer* presumption is still good law with respect to external interference with the jury's deliberative process via private communication, contact, or tampering[24] with jurors that relates directly to the matter being tried.[25] We agree with the observation, made by the Court of Appeals of Maryland in rejecting the argument that "the *Remmer* presumption . . . has been eroded in cases where egregious juror and witness misconduct occurs," that the *Remmer* presumption ensures "that a criminal defendant receives adequate due process. A right as fundamental as the right to an impartial jury cannot be compromised by even the hint of possible bias or prejudice that is not affirmatively rebutted." (Emphasis omitted.) *Jenkins* v. *State*, supra, 375 Md. 319; see id., 321–25 (applying presumption and requiring new trial when juror and witness sought each other out at weekend religious retreat held midtrial, had lunch together, and sat next to each other during seminar, particularly given court's no contact instructions, despite lack of evidence that they had discussed case). Thus, the "burden properly rests on the state for several reasons: the overarching importance of protecting the defendant's constitutional right to a fair trial, the continuing maintenance of the integrity of the jury system and the necessity of continuing to preserve the trust reposed in criminal jury verdicts." *State* v. *Rodriguez*, supra, 210 Conn. 328.

We emphasize, however, that the burden remains on the defendant to show prima facie entitlement to the *Remmer* presumption; evidence, rather than speculation, is required to shift the burden of proof to the state.[26] See *State* v. *Savage*, 161 Conn. 445, 450, 290 A.2d 221 (1971) (declining to apply *Remmer* presumption when "the trial court fully developed the facts by interrogating the jurors in question, and as a result of this interrogation the court concluded that there had been no conversation between these jurors, the complainant and her mother"); *State* v. *Zapata*, 119 Conn. App. 660, 686–87, 989 A.2d 626 (declining to apply *Remmer* presumption because "[t]here are no factual findings in the record—indeed, no facts in the record—to support the contention that [the juror's] sibling knew the victim" and defendant's argument was "predicated on assumptions"), cert. denied, 296 Conn. 906, 922 A.2d 1136 (2010), overruled on other grounds by *State* v. *Dixon*, 318 Conn. 495, 509 n.4, 122 A.3d 542 (2015); see also *Ramirez* v. *State*, supra, 7 N.E.3d 939 (defendant entitled to presumption of prejudice "only after making two showings, by a preponderance of the evidence: [1] [extrajudicial] contact or communications between jurors and unauthorized persons occurred, and [2] the contact or communications pertained to the matter before the jury"). Accordingly, because there is no dispute in the present case that the comments made by the defendant's mother to J concerned the veracity of a witness and, therefore, directly related to the matter before the jury, we conclude that the *Remmer* presumption was triggered in this case.

Finally, the *Remmer* presumption is "not conclusive. The burden rests heavily on the government to establish that the contact was harmless." *United States* v. *Moore*, 641 F.3d 812, 828 (7th Cir.), cert. denied, U.S. , 132 S. Ct. 436, 181 L. Ed. 2d 283 (2011). The state bears this "heavy burden" of proving that there was no " 'reasonable possibility' " that the tampering or misconduct affected the jury's impartiality. *United States* v. *Rutherford*, supra, 371 F.3d 641; accord *United States* v. *Cheek*, 94 F.3d 136, 142 (4th Cir. 1996); *State* v. *Asherman*, 193 Conn. 695, 741–42, 478 A.2d 227 (1984) (state proved improper experimentation by jury harmless beyond reasonable doubt), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985).

II

Accordingly, we now turn to the defendant's claim that the state did not meet its " 'heavy burden' " of rebutting the *Remmer* presumption in this case. The defendant argues that the trial court improperly relied on J's assurances of impartiality in finding that the misconduct in the present case did not deprive him of a trial before a fair and impartial jury. Specifically, the defendant claims that the record demonstrates that J was not candid with the court when he failed to disclose

numerous "critical" details about his encounter with the defendant's mother, namely, his concern about the presence of the two young women with cell phones who might record the incident to prove jury tampering and cause a mistrial. The defendant also contends that the "close familial relationship" between himself and the person who tampered with the jury was "extraordinarily prejudicial" because it would lead jurors to suspect that the defendant instigated the jury tampering in an effort to cause a mistrial, leading them to resent him in their deliberations. The defendant further argues that the jury itself committed misconduct by discussing the encounter among themselves prior to the court summoning them for voir dire. He also posits that, "where [J] and [the] other jurors had already discussed the matter, there is reason to believe [the] jurors would disregard the court's instruction during the hearing not to discuss the matter, if only briefly and reference [the] defendant's mother."

In response, the state argues that it satisfied its burden of proving that the encounter between J and the defendant's mother did not violate the defendant's right to a fair trial before an impartial jury. The state emphasizes that J's credibility was a matter for the trial court to assess, and that the record does not indicate that he intentionally withheld information from the court. The state maintains that J was not sure whether the two women outside the courthouse were videotaping the encounter, thus, furnishing a reason for not conveying that fact to the trial court. We agree with the state, and conclude that the record and the findings of the trial court demonstrate that the state carried its burden of proving that there was no reasonable possibility that the actions of the defendant's mother affected the jury's impartiality.

Having reviewed the record in this case, we are satisfied that the trial court did not abuse its discretion in denying the defendant's motion for a mistrial.[27] The trial court, with its superior vantage point to assess the credibility of the testifying jurors, reasonably could have believed the testimony of J and the other jurors that the actions of the defendant's mother did not affect their impartiality or their ability to decide the case based solely on the evidence admitted at trial. "The nature and quality of the juror's assurances is of paramount importance; the juror must be unequivocal about his or her ability to be fair and impartial." *State* v. *Osimanti*, supra, 299 Conn. 36. Thus, we note that the transcript does not reveal any equivocation by the jurors in attesting to their continued impartiality. Evaluation of any equivocation evinced in tone or manner remains in the province of the trial judge.[28] See, e.g., *State* v. *Newsome*, supra, 238 Conn. 631; *State* v. *Cubano*, 203 Conn. 81, 92, 523 A.2d 495 (1987); see also *United States* v. *Farhane*, supra, 634 F.3d 169–70 (The trial court reasonably concluded that a juror's discovery of a code-

fendant's guilty plea through an impermissible Internet search did not require a mistrial when "no juror indicated that he or she would have a problem following . . . instructions" to consider only evidence admitted at trial and not to " 'draw any inference, favorable or unfavorable, toward the government or the defendant from the fact that any person in addition to the defendant is not on trial here. You also may not speculate as to the reasons why other persons are not on trial.' "). Further, J's act of coming forward on his own supports the trial court's assessment of his credibility and lack of animus toward the defendant. Had the actions of the defendant's mother "left [J] inclined to be less than fair and impartial toward the defendant, [J] likely would have kept that information to himself in an attempt to ensure that he remained on the jury to vote to convict the defendant." *State* v. *Osimanti*, supra, 37. To the extent that the defendant relies on J's failure to mention during voir dire the presence of the two young women with cell phones or his concern for a mistrial, the trial court reasonably could have attributed those omissions to J's lack of certitude on that point, given that cell phones with cameras are ubiquitous, and the testimony of S and L that J's observations about the women were vague and speculative.

Finally, some of the jurors, specifically, J himself and L, expressed understanding for the actions of the defendant's mother, given her obvious concern for the defendant's future. This strongly supports the trial court's determination that the jurors were not biased against the defendant as a result of his mother's actions.[29] Cf. *State* v. *Rhodes*, supra, 248 Conn. 50–51 (The juror's improper conversations with her boyfriend "were not prejudicial to the defendant" because they "provided [her] with reasons to view the state's case with suspicion. [The boyfriend's] other trial-related comments to [the juror] also could not reasonably be construed as harmful or otherwise unfavorable to the defendant."). We, therefore, conclude that the state has established that there is no reasonable possibility that the actions of the defendant's mother affected the jury's ability to act fairly and impartially in deciding this case. Accordingly, the trial court did not abuse its discretion in denying the defendant's motion for a mistrial.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] We note that the name of this individual is not apparent from the record.

[3] In accordance with our usual practice, we identify jurors by initial in order to protect their privacy interests. See, e.g., *State* v. *Osimanti*, 299 Conn. 1, 30 n.28, 6 A.3d 790 (2010).

[4] Additional voir dire questioning by the state established that the encounter occurred on the street near the courthouse parking lot, and that J recognized the defendant's mother from the courtroom. After describing her appearance, J testified that he walked "slower" because of his physical limitations, and that "[s]he came up behind me and she said, boy, I hope

everything turns out okay, and then I looked and then I recognized her."

[5] The trial court and J engaged in the following colloquy:

"The Court: I'll probably have to interview each of [the other jurors], but speaking only for you, let me ask you this: As you know, the rule in this and in every case, civil or criminal, the jury must make its decision based exclusively on the evidence presented in court.

"[J]: Of course.

"The Court: I, of course, wish lots of things, it's certainly not proper that anybody connected with any side approach you and tell you anything. We know from sad experience this has happened prior times in the history of the world, and the question, you are still under sworn duty to decide the case based entirely on the evidence and only on the evidence presented in court, so do you feel that your ability to do so has in any way been compromised?

"[J]: Not at all.

"The Court: You feel that you could—you haven't heard all the evidence yet?

"[J]: No.

"The Court: You could make your decision fair and square based upon the evidence?

"[J]: Correct."

[6] The trial court advised the jury that: "Ladies and gentlemen, I am sorry to delay things here, but there is something that I have to do. This won't come as any surprise to you from what I understand, but I understand [J] may—and no criticism of him at all—may have made some statement to you about an incident that apparently happened yesterday. I need to question each of you about it to ensure that you could be fair, continue to be fair and impartial jurors and decide the case based exclusively on the evidence presented in court, and I have talked with [J] and [E], and I'm going to try to briefly individually voir dire each of the rest of you. In the meantime, and, in fact, throughout the rest of this proceeding, please do not discuss this incident among yourselves or with anyone else."

[7] In further questioning by defense counsel about whether J had "said something about a mistrial," S stated: "He didn't, he wasn't sure whether that—what they were—you know, he wasn't sure whether he was being taped so they could say mistrial because of him talking to the [defendant's mother], so he wanted to say something this morning." S stated that J did not explain his understanding of the term "mistrial" to the other members of the jury.

[8] In assuring the trial court that he would decide the case based solely on the evidence presented in court in accordance with the juror's oath, L acknowledged his assumption that "everybody involved in the case has very high emotions about it and, you know, has a lot of skin in the game, has big stakes in their lives concerning it, but that's not what we're being presented. We're being presented with the evidence of what happened and that's what we have to decide on."

[9] In denying the defendant's renewed motion for a mistrial premised on his disagreement with the findings underlying its initial ruling, the trial court emphasized that it did not find or suggest that the defendant or his mother had intentionally tried to provoke a mistrial, but rather, that the defendant "shouldn't be the beneficiary if his mother approaches a member of the jury with this kind of communication." The trial court reiterated its view that the actions of the defendant's mother were "an outrageous act," and that "for a mistrial to result . . . would be outrageous unless the jury had, in fact, been contaminated. And I have found, after a thorough voir dire by both court and counsel that the jury has not, in fact, been contaminated."

[10] We note that the defendant does not appear to challenge the manner or scope of the hearing in which the trial court considered the allegation of jury tampering in accordance with *State* v. *Brown*, supra, 235 Conn. 526, under which a "trial court must conduct a preliminary inquiry, on the record, whenever it is presented with any allegations of jury misconduct in a criminal case, regardless of whether an inquiry is requested by counsel. Although the form and scope of such an inquiry lie within a trial court's discretion, the court must conduct some type of inquiry in response to allegations of jury misconduct. That form and scope may vary from a preliminary inquiry of counsel, at one end of the spectrum, to a full evidentiary hearing at the other end of the spectrum, and, of course, all points in between. Whether a preliminary inquiry of counsel, or some other limited form of proceeding, will lead to further, more extensive, proceedings will depend on what is disclosed during the initial limited proceedings and on the exercise of the

trial court's sound discretion with respect thereto." (Footnote omitted.) "We recognize that the trial judge has a superior opportunity to assess the proceedings over which he or she personally has presided . . . and thus is in a superior position to evaluate the credibility of allegations of jury misconduct, whatever their source. There may well be cases, therefore, in which a trial court will rightfully be persuaded, solely on the basis of the allegations before it and the preliminary inquiry of counsel on the record, that such allegations lack any merit. In such cases, a defendant's constitutional rights may not be violated by the trial court's failure to hold an evidentiary hearing, in the absence of a timely request by counsel." (Citations omitted.) Id., 527–28; see also *State* v. *Dixon*, supra, 318 Conn. 506.

[11] The state further argues that the hearing held by the trial court in this case complied with the mandates of *Remmer I*, supra, 347 U.S. 229, because "all parties were aware of the approach by the defendant's mother to [J] immediately after it occurred," and the court "conducted a thorough hearing in the defendant's presence and with his participation in order to determine whether the defendant's right to an unbiased jury was compromised." As noted previously; see footnote 10 of this opinion; the defendant does not challenge the scope of the hearing in this case, beyond the allocation of the burden of proof.

[12] On appeal after remand, the Supreme Court concluded that the bribe offer and subsequent FBI investigation deprived the defendant of a fair trial. *Remmer II*, supra, 350 U.S. 382. After reviewing the entire record, the Supreme Court emphasized that the evidence showed that the juror had been under " 'terrific pressure,' " and that the "evidence, covering the total picture, reveals such a state of facts that neither [the juror] nor anyone else could say that he was not affected in his freedom of action as a juror. From [the juror's] testimony it is quite evident that he was a disturbed and troubled man from the date of the [bribe offer] until after the trial. Proper concern for protecting and preserving the integrity of our jury system dictates against our speculating that the [FBI] agent's interview with [the juror], whatever the [g]overnment may have understood its purpose to be, dispersed the cloud created by [the bribe offer]." Id., 381; see also id., 382 (observing that juror "had been subjected to extraneous influences to which no juror should be subjected, for it is the law's objective to guard jealously the sanctity of the jury's right to operate as freely as possible from outside unauthorized intrusions purposefully made").

[13] To this end, the Supreme Court rejected the petitioner's reliance on the doctrine of imputed bias in support of his contention that "a court cannot possibly ascertain the impartiality of a juror by relying solely upon the testimony of the juror in question." *Smith* v. *Phillips*, supra, 455 U.S. 215.

[14] The court further observed that, if due process required "a new trial every time a juror has been placed in a potentially compromising situation . . . few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. *Such determinations may properly be made at a hearing like that ordered in* [*Remmer I*] *and held in this case.*" (Emphasis added.) *Smith* v. *Phillips*, supra, 455 U.S. 217.

[15] This court applied the *Remmer* presumption in numerous cases of jury misconduct or tampering through the 1989 decision in *State* v. *Rodriguez*, supra, 210 Conn. 319–27, which held that the state had rebutted the presumption of prejudice arising from a sexual assault defendant's act of approaching a known juror at a food truck outside the courthouse before the trial began. See also, e.g., *State* v. *Asherman*, 193 Conn. 695, 736, 478 A.2d 227 (1984) (The court cited *Remmer I* and stated that "[c]onsideration of extrinsic evidence is presumptively prejudicial because it implicates the defendant's constitutional right to a fair trial before an impartial jury. . . . A presumption of prejudice may also arise in cases involving communications between a juror and third persons. . . . But unless the nature of the misconduct on its face implicates [the defendant's] constitutional rights the burden is on [him] to show that the error of the trial court is harmful." [Citations omitted.]), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). Interestingly, in *State* v. *Rodriguez*, supra, 327–28, when applying the presumption of prejudice, this court also cited *Smith* v. *Phillips*, supra, 455 U.S. 215, and *State* v. *Almeda*, 189 Conn. 303, 313, 455 A.2d 1326 (1983), for

the proposition that "the United States Supreme Court [has] 'long held that the remedy for allegations of juror partiality is a hearing *in which the defendant has the opportunity to prove actual bias.*'" (Emphasis added.)

[16] This line of cases cited *Smith* v. *Phillips*, supra, 455 U.S. 215, as standing for the proposition that the defendant bears the burden of proving actual bias at a hearing considering allegations of juror misconduct, presuming prejudice only when the misconduct was "authorized by the trial court," whose instructions the jurors are presumed to follow. *State* v. *Castonguay*, 194 Conn. 416, 435–36 n.19, 481 A.2d 56 (1984); compare id., 435–36 (remanding for hearing at which state would bear burden of proving harmlessness beyond reasonable doubt after trial court improperly instructed jury that it could discuss case prior to deliberations), with *State* v. *Newsome*, 238 Conn. 588, 628–30, 682 A.2d 972 (1996) (citing, inter alia, *Castonguay* and *Phillips* in requiring defendant to prove prejudice arising from presubmission discussion by jury and single juror's views of crime scene), and *State* v. *Almeda*, 189 Conn. 303, 311–14, 455 A.2d 1326 (1983) (citing *Phillips* in remanding case for hearing at which defendant would have opportunity to prove actual bias arising from jury foreman's failure to disclose during voir dire his significant connections with law enforcement).

[17] Rejecting the defendant's attempt to distinguish *Smith* v. *Phillips*, supra, 455 U.S. 218, as arising from a federal habeas corpus challenge to a state court proceeding, rather than a direct review of a federal proceeding as in *Remmer I*, the Sixth Circuit emphasized that "[*Remmer I*] placed a heavy burden of proof upon the government. Accordingly, *Phillips* worked a substantive change in the law." *United States* v. *Pennell*, 737 F.2d 521, 532–34 and n.10 (6th Cir. 1984), cert. denied, 469 U.S. 1158, 105 S. Ct. 906, 83 L. Ed. 2d 921 (1985).

[18] The Fifth Circuit requires that "the trial court . . . first assess the severity of the suspected intrusion; only when the court determines that prejudice is likely should the government be required to prove its absence. This rule comports with our [long-standing] recognition of the trial court's considerable discretion in investigating and resolving charges of jury tampering." *United States* v. *Sylvester*, 143 F.3d 923, 934 (5th Cir. 1998); see also id., 934–35 (concluding that trial court improperly conducted ex parte inquiry into jury tampering and remanding case for "a hearing to determin[e] whether the jury was prejudiced by the outside contacts" when multiple jurors received telephone calls about case); compare *United States* v. *Smith*, 354 F.3d 390, 395–96 (5th Cir. 2003) (trial court properly declined to impose presumption given "de minimis intrusion" when jury learned of existence of transcript that was not in evidence because they did not review transcript, and its content was cumulative of trial testimony), cert. denied, 541 U.S. 953, 124 S. Ct. 1698, 158 L. Ed. 2d 386 (2004), with *United States* v. *Mix*, 791 F.3d 603, 608–11 (5th Cir. 2015) (defendant showed sufficient likelihood of prejudice to justify shift of burden to government when juror overheard information in elevator about prosecutions of defendant's colleagues).

[19] "In considering this circuit split, we note that it is well settled that decisions of the Second Circuit, while not binding upon this court, nevertheless carry particularly persuasive weight in the resolution of issues of federal law when the United States Supreme Court has not spoken on the point." (Internal quotation marks omitted.) *Dayner* v. *Archdiocese of Hartford*, 301 Conn. 759, 783, 23 A.3d 1192 (2011).

[20] In assessing the severity of the harm "[w]here an extraneous influence is shown," the Second Circuit requires the court to "apply an objective test, assessing for itself the likelihood that the influence would affect a typical juror. . . . A trial court's [postverdict] determination of extra-record prejudice must be an objective one, focusing on the information's probable effect on a hypothetical average juror." (Citation omitted; internal quotation marks omitted.) *United States* v. *Greer*, 285 F.3d 158, 173 (2d Cir. 2002); see also id. (rule 606 [b] of Federal Rules of Evidence precludes court from inquiring about or considering degree to which extra-record information influenced deliberations themselves, although court can consider circumstances under which external interference occurred).

[21] We note that the Eleventh Circuit has continued to apply the *Remmer* presumption, while acknowledging, but declining to resolve, questions concerning its continued viability. See, e.g., *United States* v. *Siegelman*, 640 F.3d 1159, 1182 n.33 (11th Cir. 2011); *United States* v. *Ronda*, 455 F.3d 1273, 1299 and n.36 (11th Cir. 2006).

[22] Our research indicates that the courts of the following states apply the *Remmer* presumption without having specifically considered its continuing vitality in light of *Phillips* and *Olano*. See *Smith* v. *State*, Docket No. A-5636, 1996 WL 596942, *4–5 (Alaska App. October 9, 1996); *In re Price*, 51

Cal. 4th 547, 560, 247 P.3d 929, 121 Cal. Rptr. 3d 572 (2011); *Black* v. *State*, 3 A.3d 218, 220–21 and n.8 (Del. 2010); *Amazon* v. *State*, 487 So. 2d 8, 11 (Fla.), cert. denied, 479 U.S. 914, 107 S. Ct. 314, 93 L. Ed. 2d 288 (1986); *State* v. *Chin*, 135 Haw. 437, 446–47, 353 P.3d 979 (2015); *Hodge* v. *Commonwealth*, 68 S.W.3d 338, 342 (Ky. 2001); *State* v. *Compton*, 66 So. 3d 619, 637–39 (La. App.), writ denied, 76 So. 3d 1177 (La. 2011); *Commonwealth* v. *Dixon*, 395 Mass. 149, 152, 479 N.E.2d 159 (1985); *State* v. *Erickson*, 610 N.W.2d 335, 338–39 (Minn. 2000); *State* v. *Rideout*, 143 N.H. 363, 367, 725 A.2d 8 (1999); *State* v. *Scherzer*, 301 N.J. Super. 363, 487, 694 A.2d 196, cert. denied, 151 N.J. 466, 700 A.2d 878 (1997); *People* v. *Anderson*, 123 App. Div. 2d 770, 773, 507 N.Y.S.2d 246 (1986), appeal denied, 69 N.Y.2d 824, 506 N.E.2d 541, 513 N.Y.S.2d 1030 (1987); *Bruckshaw* v. *Frankford Hospital*, 619 Pa. 135, 155–56 and n.7, 58 A.3d 102 (2012); *State* v. *Adams*, 405 S.W.3d 641, 650–51 (Tenn. 2013); *State* v. *McKeen*, 165 Vt. 469, 474, 685 A.2d 1090 (1996); *Lenz* v. *Warden*, 267 Va. 318, 329, 593 S.E.2d 292, cert. denied sub nom. *Lenz* v. *True*, 542 U.S. 953, 124 S. Ct. 2933, 159 L. Ed. 2d 836 (2004); *In the Matter of Woods*, 154 Wn. 2d 400, 414, 114 P.3d 607 (2005); *State* v. *Babiak*, Docket No. 2007AP169-CR, 2008 WL 786530, *4–5 (Wis. App. March 26, 2008), review denied, 310 Wis. 2d 707, 754 N.W.2d 850 (2008); *Martinez* v. *State*, 128 P.3d 652, 665 and n.15 (Wyo. 2006); see also *People* v. *Budzyn*, 456 Mich. 77, 88–89, 566 N.W.2d 229 (1997) (applying burden shift as matter of state law, requiring state to prove extraneous influence harmless beyond reasonable doubt once defendant proves that jury was exposed to extraneous influence that "created a real and substantial possibility that they could have affected the jury's verdict" by being "substantially related to a material aspect of the case and that there is a direct connection between the extrinsic material and the adverse verdict"); *People* v. *France*, 436 Mich. 138, 157–58 and n.26, 461 N.W.2d 621 (1990) (describing *Remmer I* as "leading" case and characterizing Sixth Circuit's decision in *Pennell* as outlier); *Robinson* v. *State*, 851 S.W.2d 216, 230 (Tex. Crim. App. 1991) (applying rebuttable presumption as matter of state law), cert. denied, 512 U.S. 1246, 114 S. Ct. 2765, 129 L. Ed. 2d 879 (1994); *Mize* v. *State*, 754 S.W.2d 732, 738–39 (Tex. App. 1988) (citing *Remmer I* in accord with Texas law), petition for discretionary review refused (Tex. Crim. App. April 5, 1989).

The highest courts of Maine and New Jersey have identified, but not yet resolved this issue. See *State* v. *Cheney*, 55 A.3d 473, 480–81 (Me. 2012); *State* v. *Harris*, 181 N.J. 391, 505–506, 859 A.2d 364 (2004), cert. denied, 545 U.S. 1145, 125 S. Ct. 2973, 162 L. Ed. 2d 898 (2005).

[23] We note that some of our sister states have concluded that the *Remmer* presumption no longer is good law. We note that Kansas and Ohio follow the Sixth Circuit's unpersuasive reading of *Remmer I* and *Phillips*. See *State* v. *Jones*, 283 Kan. 186, 206–207, 151 P.3d 22 (2007); *State* v. *Phillips*, 74 Ohio St. 3d 72, 88–89, 656 N.E.2d 643 (1995), cert. denied, 517 U.S. 1213, 116 S. Ct. 1835, 134 L. Ed. 2d 938 (1996). Colorado, New Mexico, and Idaho deem the *Remmer* presumption superfluous and outdated, instead adopting an objective analysis centered on the hypothetical average juror in assessing the severity of juror misconduct or tampering. These state courts focus on rules of evidence that render the presumption difficult to rebut by prohibiting examination of jurors about their thought processes or deliberations. See *People* v. *Wadle*, 97 P.3d 932, 935–36 (Colo. 2004); *Roll* v. *Middleton*, 115 Idaho 833, 838–39, 771 P.2d 54 (App. 1989); *Kilgore* v. *Fuji Heavy Industries, Ltd.*, 148 N.M. 561, 569, 240 P.3d 648 (2010). The South Carolina Supreme Court appears to hold that the burden is on the defendant to approve actual bias, but does not mention the presumption, despite citations to both *Remmer I* and *Phillips*. *State* v. *Bryant*, 354 S.C. 390, 395, 581 S.E.2d 157 (2003) (per curiam).

South Dakota's most recent decision appears to abandon the *Remmer* presumption without saying so, which conflicts with an earlier decision on point. Compare *White* v. *Weber*, 768 N.W.2d 144, 146 (S.D. 2009) (citing *Remmer I* and *Phillips*, but stating that defendant bears burden of proof at hearing without discussing apparent conflict), with *State* v. *Boykin*, 432 N.W.2d 60, 62–63 (S.D. 1988) (stating that "[t]he standard set forth by the United States Supreme Court in [*Remmer I*], is controlling . . . [i]n a criminal case" and that "South Dakota case law is entirely consistent with [*Remmer I*]" [internal quotation marks omitted]).

Finally, West Virginia severely limits the presumption under *Remmer* by reconciling it and *Smith* v. *Phillips*, supra, 455 U.S. 209, with state case law holding that the presumption of prejudice only applies when misconduct, including extraneous influence, is induced by an interested party to litigation, specifically, the state, the defendant, or their attorneys. See *State* v. *Sutphin*, 195 W. Va. 551, 559–60, 466 S.E.2d 402 (1995); *State* v. *Daniel*, 182 W. Va. 643, 647–48, 391 S.E.2d 90 (1990); see also *State* v. *Trail*, W. Va. , 778 S.E.2d 616, 627 and n.13 (2015) ("a person's concern for a defendant does not make them an 'interested party' to the litigation").

[24] We note that, "[i]n this context, the term 'jury tampering' refers to improper external communication with a juror about a matter pending before the jury." *Stouffer* v. *Trammell*, supra, 738 F.3d 1213.

[25] In determining whether the presumption is triggered, "we refer back to the factors the Supreme Court deemed important in [*Remmer I*] itself. . . . Those factors are: any private communication; any private contact; any tampering; directly or indirectly with a juror during trial; about the matter before the jury." (Citation omitted; internal quotation marks omitted.) *Barnes* v. *Joyner*, 751 F.3d 229, 245 (4th Cir. 2014), cert. denied,    U.S.   , 135 S. Ct. 2643, 192 L. Ed. 2d 944 (2015); see also id. (cataloging "[e]xtrajudicial communications or contact with a juror" sufficient to "trigger" *Remmer* presumption such as bribe offers, suggestions or pressure to vote certain way from third parties such as spouses or local citizens, and commentary about case from court personnel such as bailiffs). Put differently, the improper contact must pertain directly to the merits of the matter, rather than merely relate to the trial more topically. See, e.g., *Wisehart* v. *Davis*, 408 F.3d 321, 326 (7th Cir. 2005) (The *Remmer* presumption must be considered in "context" because "it is so easy to imagine situations in which a 'private communication . . . with a juror during a trial about the matter pending before the jury' would not create a rational presumption of prejudice. Suppose a juror's spouse said to the juror, 'I saw you on television in the jury box, and you looked great.' That would be a private communication concerning the case, but it would not be suggestive of jury tampering."), cert. denied sub nom. *Buss* v. *Wisehart*, 547 U.S. 1050, 126 S. Ct. 1617, 164 L. Ed. 2d 353 (2006).

[26] The defendant may, of course, make this prima facie showing in the context of a hearing conducted by the trial court in response to its obligation, "when presented with any allegations of jury misconduct, [to] conduct a preliminary inquiry, sua sponte if necessary, in order to assure itself that a defendant's constitutional right to a trial before an impartial jury has been fully protected." *State* v. *Brown*, supra, 235 Conn. 528; see also id., 529 (noting trial court's discretion to determine scope of hearing in light of nature of allegations).

[27] We acknowledge the trial court's view that it was "outrageous" that the defendant conceivably could benefit from jury tampering by his mother, but emphasize that the trial court properly conducted a full voir dire of the jury when it learned of her improper actions. As the United States Court of Appeals for the Fifth Circuit stated in rejecting the government's request to "categorically dismiss" a claim of jury tampering on the ground that it was the defendant "himself who initiated the contact that may have poisoned the jury," the court observed that the defendant "has been convicted of jury tampering and for that misconduct is subject to punishment. That is an entirely discrete matter. At issue in his trial in this case was whether [the defendant] had dealt in stolen goods, not whether he had tried to corrupt the judicial system. A fair and impartial jury cannot be permitted to draw the conclusion that, because a defendant attempted to fix his trial, he is guilty of the offense for which he is being tried. It is conceivable that a defendant, innocent of the charge being tried, might attempt to tamper with a jury to assure a favorable verdict. Some may suggest that our holding today will encourage defendants to tamper with juries, furnishing defendants with a 'heads-I-win, tails-you-lose' proposition: a successful effort secures an acquittal, an unsuccessful effort secures reversal on appeal. We reject that suggestion. The possibility of attempts at jury tampering are ever present. The penalties for that misconduct are serious and can markedly compound a defendant's punishment." *United States* v. *Forrest*, 620 F.2d 446, 458 (5th Cir. 1980); see also, e.g., *United States* v. *Dutkel*, supra, 192 F.3d 897 (*Remmer* presumption "arises automatically" when "the intrusion is [or is suspected to be] on behalf of the defendant raising the claim of prejudice . . . because jurors will no doubt resent a defendant they believe has made an improper approach to them").

[28] The defendant also argues that E's assurances of impartiality were equivocal and conditional on his understanding that the woman involved in the encounter was not the defendant's mother. To this end, the defendant states that E had ample time after being released from questioning, but before the trial court instructed the jury not to discuss the matter further, to learn that the woman who approached J was in fact the defendant's mother. The trial court and E engaged in the following colloquy:

"The Court: . . . [B]ased upon what you personally saw yesterday and what you heard from [J] today, has your impartiality been compromised in any way?

"[E]: I don't think so. So, I at first I had assumed a relationship between

this woman and the defendant, but after thinking about it, I don't really know how, if they are related or if there is a relationship at all.

"The Court: I see.

"[E]: So, you know, I don't think so."

In the absence of an articulation from the trial court finding to the contrary, we disagree with the defendant's reading of E's testimony. We read E's testimony on this point as avoiding jumping to conclusions as to the identity of the woman who approached J, particularly given his consistent testimony later, upon questioning by defense counsel and the court, that the incident would not affect his impartiality or ability to decide the case fairly and impartially in accordance with the evidence.

[29] To this end, we disagree with the defendant's reliance on *United States* v. *Moore*, supra, 641 F.3d 830, for the proposition that J's belief that the defendant tampered with the jury to cause a mistrial "demonstrates that [J] harbored 'notion[s] of perceived guilt,'" and that he "contaminated other jurors by suggesting the same to them." First, nothing in J's testimony evinces a belief that the defendant's mother acted at his direction. Second, although it would have been misconduct for the jurors to discuss the evidence in this case before deliberations in violation of the trial court's instruction to that effect; see, e.g., *State* v. *Washington*, 182 Conn. 419, 428–29, 438 A.2d 1144 (1980); as in *Moore*, there is no indication in the record that J "discussed the facts of the case against [the defendant], or any notion of perceived guilt or innocence." *United States* v. *Moore*, supra, 830.

––––––––––––––––––––